**NCMIC FINANCE CORPORATION, Plaintiff,**

v.

**William ARTINO; Daniel Kerr; Sally Schmaltz; Pro Funding Group, LLC; and Unnamed Co–Conspirators, Defendants.**

No. 4:07–cv–00204–JEG.

United States District Court, S.D. Iowa, Central Division.

July 28, 2009.

Frank B. Harty, Benjamin Patrick Roach, Nyemaster Goode West Hansell & O'Brien PC, Des Moines, IA, for Plaintiff.

Stanley J. Thompson, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Defendants.

**ORDER**

JAMES E. GRITZNER, District Judge.

The matter before the Court for decision is the action of Plaintiff NCMIC Finance Corporation (NCMIC) against Defendants William Artino (Artino) and Pro Funding Group, LLC (PFG) (collectively Defendants).[1]

On June 13, 2007, the Court issued an injunction against Artino and PFG enforcing the restrictive covenants contained in Artino's employment agreement with NCMIC. Order of June 13, 2007, Clerk's No. 10.

On December 15, 2008, the Court commenced a bench trial on the Complaint. The bench trial concluded on December 16, 2008. Attorneys Frank Harty and Ben Roach represented NCMIC. Attorneys Stan Thompson and Sarah Franklin represented Defendants.

On January 20, 2009, both NCMIC and Defendants filed their written closing statements. The Court finds the matter fully submitted and ready for disposition. This order constitutes the Court's findings of fact and conclusions of law. Fed. R.Civ.P. 52(a) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").

**I. JURISDICTION**

The Court issued an order on November 24, 2008, denying Defendants' motion to dismiss for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Order of November 24, 2008, Clerk's No. 54. Defendants argued NCMIC failed to assert a colorable claim under the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030; and therefore the Court lacked federal question subject-matter jurisdiction. The Court determined "NCMIC's complaint adequately alleges a substantial and colorable CFAA violation against [Defendants]," without deciding the merits of NCMIC's CFAA claim. Order of November 24, 2008, at 9, Clerk's No. 54. The Court exercised supplemental subject-matter jurisdiction over NCMIC's state law claims "because those claims 'are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United

---

1. The parties entered a joint stipulation dismissing all counts against Daniel Kerr and Sally Schmaltz (Clerk's Nos. 24–25). NCMIC did not join any additional unnamed co-conspirators in this action.

States Constitution.'" Order of November 24, 2008, at 4 n. 3 (quoting 28 U.S.C. § 1367(a)).[2]

## II. FINDINGS OF FACT

After assessing the credibility of the trial witnesses and analysis of the exhibits offered into evidence, the Court finds the following facts by a preponderance of the evidence.

### A. The Parties

NCMIC is a subsidiary of NCMIC Group Inc., a financial services holding company. The original and core business of NCMIC has been to provide professional liability insurance to chiropractors. In the business division pertinent to this case, NCMIC provides lease equipment financing primarily for small-ticket healthcare items. NCMIC's leasing customer base is half chiropractic professionals and half other healthcare professionals. NCMIC's customer base comes from healthcare vendors who recruit customers to purchase or lease their healthcare equipment. The healthcare vendors forward these prospective purchasers to NCMIC to secure financing for purchasing the healthcare vendor's equipment.

Artino entered the lease finance business starting in 1984. From 2000 through June 2003, Artino founded Professional Capital Group (PCG) with Scott Stewart (Stewart). PCG was an equipment leasing business that offered direct base loans over the Internet to service healthcare vendors. Artino and Stewart both owned and operated PCG. PCG developed a business relationship with NCMIC, whereby NCMIC provided a line of credit to PCG that allowed PCG to write leases. Artino became a NCMIC employee in June 2003 when NCMIC purchased PCG and hired Artino as vice president and general manager of NCMIC's equipment-financing division.

In August 2006, Artino met with Daniel Kerr (Kerr) on at least twelve different occasions to discuss forming a new corporation called Pro Funding Group (PFG) that would compete against NCMIC and serve as a captive leasing company for ProSolutions, Inc. (PSI), a chiropractic equipment vendor. Artino considered Kerr his business partner at PFG. Artino hoped PFG could help PSI's customers secure financing with lenders in exchange for receiving commissions from PSI.

### B. Artino's Employment with NCMIC

Around August 2002, NCMIC and PCG began negotiations for an asset-purchase agreement in which NCMIC would acquire PCG. After ten months of negotiations, NCMIC purchased PCG in June 2003. As part of the transaction, Artino was offered $60,000, an employment offer as NCMIC's

---

2. The Court has discretion to and would exercise supplemental jurisdiction even if the Court dismissed NCMIC's CFAA claim. *See* 28 U.S.C. § 1367(c)(3) (stating, "district courts may decline to exercise supplemental jurisdiction ... if ... the district court has dismissed all claims over which it has original jurisdiction"). "Balancing factors such as judicial economy, convenience, fairness and comity in regard to exercise of supplemental jurisdiction over pendent state law claims," the Court concludes that supplemental jurisdiction is appropriate. *Quinn v. Ocwen Fed. Bank FSB*, 470 F.3d 1240, 1249 (8th Cir.

2006). The Court has already conducted a bench trial on this matter, and the parties have conducted discovery under the Federal Rules of Civil Procedure. Both facts strongly support the Court exercising supplemental jurisdiction over NCMIC's state-law claims. *See New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1511 (3d Cir.1996) ("Given the fact that the district court has effectively resolved the case, [the Third Circuit] feel[s] a rejection of supplemental jurisdiction would be inappropriate.").

vice president and general manager of the equipment-financing division that the parties memorialized in a written employment agreement (Employment Agreement), a severance pay package (Severance Agreement), and a personal goodwill purchase agreement (Goodwill Agreement). These agreements were all executed simultaneously as part of one transaction. Artino began employment at NCMIC on June 30, 2003. The Severance Agreement provided Artino eighteen months salary in the event of severance, while all other NCMIC executives only received twelve months severance pay. The Goodwill Agreement paid Artino one half of one percent of all leasing business booked by NCMIC during Artino's employment. Even though the Goodwill Agreement provided Artino incentives to generate a high volume of leases without regard to the riskiness of the lease, Greg Cole (Cole), NCMIC's president, testified that Artino always "made appropriate underwriting decisions." Tr. 114.

Artino explained the Goodwill Agreement's significance in the overall deal as follows: "[T]he actual form of goodwill came up as a suggestion from McGladrey [& Pullen, CPAs] for a way for us to treat the sale [of PCG] as a capital gain.... Since this was the acquisition of [PCG] and all of its—you know, our knowledge and us coming on, McGladrey came up with this personal goodwill purchase which got us capital gains treatment for tax, for income taxes on that payment." Tr. 345; 347. Artino explained that the parties agreed that the bulk of Artino's compensation would be paid through the Goodwill Agreement because of its tax implications. Artino explained, "It wasn't like ... we were disposing of [PCG] and then coming in as employees at NCMIC. I mean, that's how it got structured, but we—clearly, the consideration was for the acquisition and our efforts toward developing [PCG]." Tr. 349.

Even though NCMIC purchased PCG's intellectual property, including a website used for determining the creditworthiness of prospective customers, NCMIC believed that Artino's expertise was a primary reason for purchasing PCG's assets. Cole testified that the "big" asset NCMIC was purchasing from PCG was "the intellectual knowledge that [Artino] brought to the table, along with [Stewart], because they had been in the lease finance industry for so long and in very high level positions." Tr. 83. Cole retained every PCG employee because of their expertise in the industry. Patrick McNerney (McNerney), NCMIC Group Inc.'s chief executive officer, testified that NCMIC purchased PCG because of Artino's wealth of experience in lease finance and his experience and contacts in the business.

The Employment Agreement was part of the consideration for the NCMIC–PCG transaction. Artino read and understood the terms of the Employment Agreement, Goodwill Agreement, and Severance Agreement. Artino obtained legal counsel to review these documents before executing the sale of PCG to NCMIC. Artino's Employment Agreement contained a restrictive covenant not to compete with NCMIC or solicit NCMIC's customers for a period of eighteen months following the termination of Artino's employment and prohibiting Artino from disclosing any confidential information to NCMIC's competitors. Both the Employment Agreement and Goodwill Agreement could only be modified in writing during Artino's employment with NCMIC.

As vice president and general manager, Artino had total day-to-day control of the equipment-financing division. Artino became a NCMIC officer at the first board of directors meeting after Artino began employment at NCMIC and was an officer until his resignation became effective on

December 1, 2006. As vice president and general manager, Artino had access to and played a central role in developing NCMIC's business plan, vendor relationships, and customer relationships regarding equipment-lease financing. In NCMIC's corporate hierarchy, Artino reported directly to Cole.

In early 2006, NCMIC expressed concern that Artino's and Stewart's compensation levels were too high. Cole wrote in a performance evaluation that Artino's salary, coupled with his benefits, was too "rich" and the "single largest expense item" in the equipment-financing division. Tr. 115. In January 2006, Cole approached Artino and Stewart about changing the way their goodwill payments were calculated under the Goodwill Agreement. Cole testified that he "suggested after some time how about if we consider a quarter percent versus half percent for each of them commission and maybe up to forty percent of the net profit from the line of business share." Tr. 177. After these discussions, Artino worked with Gary Hoffman, NCMIC's chief financial officer, to figure out a way to make the equipment-financing division more profitable, but the parties never reached an agreement changing the terms of the Goodwill Agreement.

Following these discussions and attempts to renegotiate Artino's and Stewart's compensation, Stewart resigned from NCMIC in March 2006. Stewart, whose own Employment Agreement and Goodwill Agreement were substantially similar to Artino's agreements, was paid his full severance and goodwill payments upon his resignation. Stewart voluntarily left NCMIC, meaning he was not contractually entitled to eighteen months severance pay. McNerney explained that NCMIC paid the full amount because of NCMIC's concern that Stewart could argue a claim of constructive discharge. Artino testified that NCMIC's treatment of Stewart made him concerned whether NCMIC would honor his Severance and Goodwill Agreements.

## C. ProSolutions

ProSolutions, Inc. (PSI) markets a piece of chiropractic equipment called the Pro-Adjuster. PSI's founder and chief executive officer is Moe Pisciottano (Pisciottano). PSI held monthly programs where it invited chiropractors to its offices for demonstrations in an attempt to sell them chiropractic equipment. However, by far the largest proportion of PSI's business arose out of national trade shows, which occurred twice each year, in May and November. PSI would sell its chiropractic equipment and related marketing and practice-management services and then forward credit applications to equipment-leasing companies for lease financing.

NCMIC became familiar with PSI through Kerr, a former PCG employee, who joined NCMIC when it acquired PCG. NCMIC developed a substantial relationship with PSI whereby NCMIC would provide equipment leasing financing at PSI's trade shows. In advance of PSI's trade shows, PSI would forward NCMIC a list of likely attendees for credit pre-approval. NCMIC would supplement this list with "the credit decision and/or qualification" of the attendee. The attendees' names and Social Security numbers came from PSI. NCMIC would evaluate the creditworthiness of the attendees and either approve, decline, or identify what additional information was needed to make the decision and provide that to PSI. NCMIC sent employees to PSI's national trade shows in order to help facilitate the lease transactions and cement the referral relationship with PSI. PSI preferred to have its leases financed by NCMIC because of NCMIC's reputation in the chiropractic community

and the successful business relationship they had together.

During 2005 and 2006, the efforts of Artino and Kerr blossomed into a substantial referral relationship for lease financing with PSI. In terms of dollar amount, PSI was NCMIC's largest vendor, with approximately $30 million in contracts by the end of 2006. Cole testified that during the summer and fall of 2006, NCMIC had concerns about the size and volume of its PSI business. Specifically, NCMIC was concerned about the "concentration of one product type from one vendor within the finance company's equipment lease division . . . you don't want all your eggs in one basket." Tr. 88. In an e-mail dated May 24, 2006, Cole told Artino that there was too much concentration in chiropractors in general and PSI specifically, and that NCMIC needed to do something about the concentration. After a year of booking PSI business, McNerney was concerned that although NCMIC was booking a large volume of PSI business, "taking into account credit risk, . . . overhead costs, in particular the costs for [Artino's] and [Stewart's] goodwill agreement, employment agreement, that the net profit after taking out salaries and overhead wasn't as much as NCMIC wanted to have." Tr. 48. Cole testified that one reason the equipment-financing division was less profitable than other divisions was the high overhead costs required by Artino's and Stewart's Goodwill Agreements' compensation structure.

NCMIC had a credit covenant with one of its main lenders, Wells Fargo Bank, that excluded leases from NCMIC's borrowing base for any vendor with a concentration of over twenty-five percent of NCMIC's total leasing portfolio. Robert Gagne, a Wells Fargo employee who worked on NCMIC's account, testified about the concentration limits tied to NCMIC's credit line. Gagne explained there is a "percentage limitation that would allow a particular sort of lending to one company. If it gets above that, then there would be a limit as to what we want to provide to that one company." Tr. 267. Although NCMIC's concentration of PSI leases exceeded twenty-five percent in 2006, Wells Fargo waived that requirement and never prohibited NCMIC from writing additional PSI leases. Wells Fargo was also interested in purchasing a portion of NCMIC's PSI lease portfolio and had bid on a portion of the existing portfolio. Wells Fargo declined to purchase the PSI leases, and Cole testified that NCMIC's failure to sell its PSI paper meant NCMIC had a "lesser appetite to take on new business than would have existed had that paper been sold." Tr. 117–18. Despite the awareness of concentration issues concerning PSI leases, NCMIC never stopped writing PSI leases. However, McNerney testified that he wanted to increase the diversification in the equipment-financing portfolio of leases, and NCMIC's plan for 2007 was limiting the "concentrations in the various business lines." Ex. VV; Tr. 57.

### D. The November 2006 Trade Show

The events leading up to and including the November 2006 trade show serve as the basis for NCMIC's allegations against Artino. Artino emphasizes several e-mails between Cole and Artino discussing how much leasing volume NCMIC would be willing to book at the November 2006 trade show. On May 24, 2006, Cole wrote Artino an e-mail stating that PSI leasing volume should slow down. The May 24 e-mail also explained that PSI should have more than one funding source. Cole agreed this e-mail implies that in order for PSI to acquire another funding source, that source would be a NCMIC competitor. On July 27, 2006, Cole reiterated NCMIC's position to Artino that NCMIC

should "target a maximum of $20 million to be held on our books and shoot for sales at least twice each year to stay at or below the $20 million level." Ex. 55. On August 11, 2006, Cole again told Artino "the best option is to tell [Pisciottano] he has to develop other outlets asap as we cannot be his primary funding source simply due to the concentration it presents." Ex. UU.

In the summer or early fall of 2006, NCMIC determined that it could not write an unlimited amount of PSI business. Cole and Artino started discussing "hold" positions, whereby NCMIC's portfolio of PSI leases would not permanently exceed a certain amount, such as $20 million. NCMIC's plan was to sell portions of its PSI portfolio to free up portfolio space to write new PSI business. To accomplish this purpose, NCMIC had several financial companies interested in purchasing portions of its PSI portfolio, including LEAF Financial Corporation (LEAF), Wells Fargo, and National City Corporation (National City). During negotiations with each of these companies, NCMIC used confidentiality agreements, NCMIC controlled which information the purchasers saw, and NCMIC only provided information about existing booked leases, not future lease prospects.

On November 3, 2006, a potential partial sale of NCMIC's PSI portfolio was pending with National City, and Cole set a limit of $7 million of new PSI business to be originated through the end of the year. Cole wrote Artino an e-mail telling Artino to "get with [Pisciottano] ASAP and find another outlet for the upcoming convention business." Ex. H. At that time, Cole did not see a need for NCMIC to send any employees to the November 2006 trade show because there was a good chance it would fulfill its $7 million in leasing volume even without sending a representative since NCMIC was PSI's preferred lender, and due to the pre-approval activity al-

ready occurring. Cole also instructed Artino to help PSI find other outlets for lease business that NCMIC did not want to write. Cole testified that he only intended for Artino to introduce PSI to other potential lenders due to his significant industry knowledge and contacts. When this e-mail was sent, NCMIC had $28 million in PSI paper; if another $7 million had been added it would have totaled $35 million, which would have exceeded its twenty-five percent concentration limit.

On November 8, 2006, Cole increased the amount of lease volume NCMIC could undertake for new PSI leases for the rest of 2006 from $7 million to $10 million. NCMIC wanted to write pre-approvals for the November 2006 trade show, at least to those customers with good credit, whom Cole considered "solid deals," and write $10 million in leases to those customers. On November 9, 2006, Cole reiterated NCMIC's intent to write up to $10 million of new PSI business through the end of 2006, even after the potential sale of part of the PSI lease portfolio to National City fell through.

From late October 2006 through the November 2006 trade show held on November 17 and 18, 2006, NCMIC and PSI were in communication about NCMIC's pre-approval of chiropractor leases in advance of the November 2006 trade show. NCMIC remained committed to writing additional business for PSI because many of its customers had existing relationships with NCMIC, and NCMIC's core business was chiropractors. At no time prior to the outset of this litigation did NCMIC stop writing PSI leases.

Artino attended the November 2006 trade show as a NCMIC employee and officer. Artino received NCMIC's customer spreadsheet containing the names of the attendees of the November 2006 trade show from Melissa Ehlers (Ehlers), a

NCMIC employee, on November 7, 2006. Artino forwarded the customer spreadsheet from his work e-mail account to his personal e-mail account. Cole testified that Artino could have made a copy of the customer spreadsheet and was authorized to do so. At the November 2006 trade show, Artino introduced PSI to LEAF, NCMIC's competitor in the equipment finance business. Artino and Kerr worked with PSI to place leases with LEAF. Artino introduced LEAF representatives to Pisciottano, and Artino believed that he did so at Cole's direction, which Cole denies. Artino noted the PSI leases that he booked for LEAF on a printed copy of NCMIC's spreadsheet. Artino and Kerr used NCMIC's pre-approval list to keep track of the November 2006 trade show attendees' credit scores and approval status with LEAF. Artino and Kerr used NCMIC's computer system to obtain the credit score information that they wrote on this spreadsheet. Kerr would book leases for LEAF, even though the leases were pre-approved by NCMIC, and booked them with LEAF to earn a commission from LEAF. At the time of the November 2006 trade show, Artino and LEAF had an implied understanding that Artino would get compensation from LEAF for PSI referrals at the November 2006 trade show. Artino believed he could keep LEAF's commissions from the November 2006 trade show because in his view NCMIC abandoned the business. Artino never told McNerney or Cole of his intent to work with PSI to find lease sources other than NCMIC, including direct referrals to LEAF.

After the November 2006 trade show, Artino and Kerr used NCMIC time, telephone, and computer resources to assist LEAF book PSI leases. At least thirty PSI leases booked by Artino and Kerr for LEAF were completed by the time of Artino's resignation. Artino and Kerr worked to book those leases while Artino was still employed by NCMIC. At the November 2006 trade show, Cole testified that NCMIC would have written PSI leases with credit scores above 650, and NCMIC had never prohibited any employee from writing PSI leases with higher credit scores.[3] NCMIC actually wrote substantial amounts of PSI leases throughout 2006, even after the November 2006 trade show. NCMIC did book $2.5 million in new leases from the November 2006 trade show. NCMIC also wrote over $1.5 million in PSI leases in 2007 and 2008.

### E. Artino's Resignation from NCMIC

Artino announced his resignation from NCMIC in mid-October 2006, and his last day as a NCMIC employee was December 1, 2006. After Artino's resignation, NCMIC paid Artino $191,250 severance pay under the Severance Agreement, which equaled eighteen months of his base salary. NCMIC also paid Artino $467,820 goodwill pay under the Goodwill Agreement. McNerney testified that NCMIC made these payments to prevent any claim

---

**3.** Cole testified that Figure 6.1 of Exhibit 57 listed the leases NCMIC had approved but never funded because Kerr and Artino booked those leases for LEAF. Cole testified that Figure 7.1 listed the leases booked by LEAF that NCMIC most likely would have approved based on the known credit information and customer histories for those individuals. All the individuals on Figure 7.1 were NCMIC policyholders or lessees, which greatly improved their chance of NCMIC approving them even for a second lease. Kerr testified Artino and Kerr booked PSI leases for LEAF for chiropractors who did not attend the November 2006 trade show. Tr. 201. NCMIC's counsel notes that on the list of leases Artino and Kerr prepared for LEAF, forty-three chiropractors were not on the list of attendees at the November 2006 trade show. Comparing Ex. 6 and Exs. 4 and 5.

of unfair treatment and to compensate Artino for the eighteen month non-compete agreement NCMIC expected Artino to obey, even though NCMIC was not required to make such payments because Artino voluntarily resigned. McNerney and Cole testified that NCMIC would not have paid Artino severance or goodwill payments if NCMIC had knowledge that Artino was booking leases with LEAF in exchange for commissions. In discussions with McNerney and Cole, Artino told them he was leaving the leasing industry after his resignation. Artino did not inform McNerney or Cole that he planned to help PSI place leases with LEAF, and both McNerney and Cole testified that they would never authorize Artino to book leases on LEAF's behalf. Artino denies this and claims he informed Cole that he was going to consult with Pisciottano.

Kerr subsequently resigned from NCMIC and joined Artino at PFG. Kerr testified that PFG was not set up to compete with NCMIC but that he and Artino hoped NCMIC would be PFG's funding partner. Kerr testified that Artino told him he did not think he was violating his non-compete agreement because NCMIC was trying to reduce their PSI volume and subjectively believed that NCMIC would not want this additional business. However, Kerr testified that he and Artino "actually time[d their] departures from NCMIC so as to not arouse suspicion." Tr. 186.

PFG received $169,207.51 in commissions from LEAF for the November 2006 trade show on January 22, 2007, and $33,955.17 in commissions from LEAF on March 12, 2007, for a total of $203,162.68. Of that amount, PFG paid Artino $27,164.07 based on Artino's efforts at the November 2006 trade show. PFG continued doing business until this Court ordered an injunction on June 13, 2007, prohibiting PFG from soliciting PSI business. Order of June 13, 2007, Clerk's No. 10.

## III. CONCLUSIONS OF LAW

### A. Count One: Computer Fraud and Abuse Act (CFAA) Against Artino[4]

NCMIC has pleaded two distinct civil claims against Artino under the CFAA: one under 18 U.S.C. § 1030(a)(2)(C) and one under 18 U.S.C. § 1030(a)(4). The parties dispute three issues: (1) whether §§ 1030(a)(2)(C) and 1030(a)(4) confer liability to an agent-employee who had authority to access his employer's computer but proceeded to use that access to breach his duty of loyalty to his employer; (2) whether NCMIC can establish a prima facie CFAA case under §§ 1030(a)(2)(C) and 1030(a)(4); and (3) whether NCMIC can satisfy the requisite amount of compensable damages under the CFAA to maintain a cause of action.

### 1. Without Authorization

▮ When construing the terms of a statute, the Court must begin with the statute's plain language. *Dahl v. R.J. Reynolds Tobacco Co.*, 478 F.3d 965, 969 (8th Cir.2007). The Court's "objective in interpreting a federal statute is to give effect to the intent of Congress. When no specific definition for a term is given in the statute itself, [the Court] look[s] to the ordinary common sense meaning of the words. Absent clearly expressed legislative intent to the contrary, the language is regarded as conclusive." *Watson v. Ray*, 192 F.3d 1153, 1155–56 (8th Cir.1999) (internal citations and quotations omitted).

---

4. The Court has previously addressed the applicability of CFAA in its Order of November 24, 2008 (Clerk's No. 54 at pp. 7–11), and incorporates that discussion while again addressing the import of CFAA under the ultimate facts.

NCMIC argues the CFAA confers liability on an employee who accesses an employer's computer in order to obtain business information for his own personal benefit and to the detriment of his employer, thereby breaching his duty of loyalty to his employer (the broad view),[5] while Artino argues the CFAA confers liability only when the employee's initial access to the computer is not permitted and subsequently misappropriates the employer's information (the narrow view).[6] The Eighth Circuit has not yet ruled on the issue, which requires the Court to interpret the statute's meaning.

Under the CFAA, conduct "exceed[ing] authorized access" is defined as "access[ing] a computer with authorization and us[ing] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." *Id.* § 1030(e)(6). The CFAA does not define "authorization." The issue for the Court to decide is whether an employee may act "without authorization" or "exceeds authorized access" when he accesses confidential and proprietary business information from his employer's computer that he has permission to access, but then uses that information in a manner inconsis-

tent with the employer's interests or in violation of other contractual obligations, and where the employee intended to use the information in that manner at the time of access.

▪ "Authorize indicates permission endowing the power or right to act." Webster's New Int'l Dictionary 147 (3d ed.2002). Consistent with the CFAA's definition as stated in section 1030(e)(6), a person "exceeds authorized access" when that person possesses a minimum level of access to a computer—a limited power to act—but then accesses the computer beyond the level of access which the access-grantor intended. *See EF Cultural Travel BV*, 274 F.3d at 583–84 (concluding that where a former employee of the plaintiff provided another company with proprietary information in violation of a confidentiality agreement in order to "mine" his former employer's publically accessible website for certain information, he exceeded the authorization he had to navigate the website). In the employment context, an employee "exceeds authorized access" when the employee accesses information that he is not entitled to view but does not

5. *See, e.g., Int'l Airport Ctrs., L.L.C. v. Citrin,* 440 F.3d 418, 420–21 (7th Cir.2006); *EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 582–84 (1st Cir.2001); *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.,* 556 F.Supp.2d 1122, 1131 (E.D.Cal. 2008); *Res. Ctr. for Indep. Living, Inc. v. Ability Res., Inc.,* 534 F.Supp.2d 1204, 1210–11 (D.Kan.2008); *ViChip Corp. v. Lee,* 438 F.Supp.2d 1087, 1100 (N.D.Cal.2006); *Pac. Aero. & Elecs., Inc. v. Taylor,* 295 F.Supp.2d 1188, 1195–97 (E.D.Wash.2003); *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121, 1125 (W.D.Wash. 2000); *see also Ervin & Smith Advertising & Pub. Relations, Inc. v. Ervin,* No. 8:08CV459, 2009 WL 249998, at *7–8 (D.Neb. Feb. 3, 2009); *Nilfisk–Advance, Inc. v. Mitchell,* No. 05–5179, 2006 WL 827073, at *2 (W.D.Ark. Mar. 28, 2006); *Personalized Brokerage Servs.,*

*LLC v. Lucius,* No. 05–1663, 2006 WL 2975308, at *2 (D.Minn. Jan. 26, 2006).

6. *See, e.g., Lasco Foods, Inc. v. Hall and Shaw Sales, Mktg., & Consulting, LLC,* 600 F.Supp.2d 1045, 1053 (E.D.Mo.2009); *Black & Decker (US), Inc. v. Smith,* 568 F.Supp.2d 929, 933 (W.D.Tenn.2008); *Shamrock Foods Co. v. Gast,* 535 F.Supp.2d 962, 964 (D.Ariz. 2008); *Diamond Power Int'l, Inc. v. Davidson,* 540 F.Supp.2d 1322, 1341–43 (N.D.Ga.2007); *Int'l Ass'n of Machinists & Aero. Workers v. Werner–Matsuda,* 390 F.Supp.2d 479, 498–99 (D.Md.2005); *SecureInfo Corp. v. Telos Corp.,* 387 F.Supp.2d 593, 608–10 (E.D.Va.2005); In re *America Online, Inc. Version 5.0 Software Litig.,* 168 F.Supp.2d 1359, 1370–71 (S.D.Fla. 2001); *see also Condux Int'l, Inc. v. Haugum,* No. 08–4824, 2008 WL 5244818, at *6 (D.Minn. Dec. 15, 2008).

breach his duty of loyalty to the company's business interests.

■ In contrast, a person is "without authorization" when an individual either (1) has never been granted access to the computer yet obtains access to the computer without the access-grantor's permission, *see Shurgard,* 119 F.Supp.2d at 1126 ("[I]ntruders often alter existing log-on programs so that user passwords are copied to a file which the hackers can retrieve later."), or (2) has been granted access as the access-grantor's agent but loses authorization to access the computer when the agent breaches his duty of loyalty, *see id.* at 1125 ("Unless otherwise agreed, the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal." (quoting Restatement (Second) of Agency § 112)). Courts, acknowledging the importance of agency law in discussing "authority," have applied agency law to federal statutes to effect the statute's clear language and its intended purpose. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 803 n. 3, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (interpreting Title VII as requiring an employer's vicarious liability for its employees' sexual harassment because "our obligation here is not to make a pronouncement of agency law in general ... [but] adapt agency concepts to the practical objectives of Title VII"); *Commerford v. Olson,* 794 F.2d 1319, 1323 (8th Cir. 1986) (interpreting federal securities laws and finding that applying "common law agency principles to determine secondary liability for violations of the securities acts does not expose corporations, employers, and other such potential defendants to strict liability for all acts of their agents or cause them to be insurers of their agent's actions").

Judge Richard A. Posner of the Seventh Circuit Court of Appeals explains the difference between "without authorization" and "exceeding authorized access" as defined by the CFAA:

> Muddying the picture some, [the CFAA] distinguishes between "without authorization" and "exceeding authorized access," and, while making both punishable, defines the latter as "accessing a computer with authorization and ... using such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." That might seem the more apt description of what [the employee] did.

> The difference between "without authorization" and "exceeding authorized access" is paper thin, but not quite invisible. In *EF Cultural Travel BV ...,* for example, the former employee of a travel agent, in violation of his confidentiality agreement with his former employer, used confidential information that he had obtained as an employee to create a program that enabled his new travel company to obtain information from his former employer's website that he could not have obtained as efficiently without the use of that confidential information. The website was open to the public, so he was authorized to use it, but he exceeded his authorization by using confidential information to obtain better access than other members of the public. Our case is different. [The employee's] breach of his duty of loyalty terminated his agency relationship (more precisely, terminated any rights he might have claimed as [the employer's] agent—he could not by unilaterally terminating any duties he owed his principal gain an advantage!) and with it his authority to access the laptop, because the only basis of his authority had been that relationship. Violating the duty of loyalty, or failing to disclose adverse interests, voids the agency relationship. Unless otherwise agreed, the authority of the

agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal. *Citrin,* 440 F.3d at 420–21 (some internal citations and quotations omitted).

The Court concludes that the broad view can best distinguish between the CFAA's statutory language "exceeds authorized access" and "unauthorized access" by looking solely at the text of the statute. Additionally, the First and Seventh Circuit Courts of Appeals have adopted the broad view, and the Fifth Circuit has acknowledged the broad view in dicta; in contrast, no Courts of Appeals decisions have adopted the narrow view of the CFAA.[7] *See United States v. Phillips,* 477 F.3d 215, 220–21 (5th Cir.2007) ("Neither [the defendant], nor members of the public, obtain such authorization from [the website] merely by viewing a log-in page, or clicking a hypertext link. Instead, courts have recognized that authorized access typically arises only out of a contractual or agency relationship. While [the defendant] was authorized to use his [e-mail account on the website] and engage in other activities defined by [the website's] acceptable computer use policy, he was never authorized to access [a particular program on the website].").

The legislative history of § 1030(e)(6) supports the broad view. In 1994 Congress amended the CFAA, which was originally a criminal statute, to include a private cause of action when the alleged conduct involves certain enumerated factors. *Id.* § 1030(g). The 1994 amendment was intended "to expand the statute's scope to include civil claims challenging the unauthorized removal of information or programs from

a company's computer database." *Pac. Aero.,* 295 F.Supp.2d at 1196. As noted by the Third Circuit, "the scope of [the CFAA's] reach has been expanded over the last two decades." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC,* 428 F.3d 504, 510 (3d Cir.2005). "Employers ... are increasingly taking advantage of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system." *Id.* (quoting *Pac. Aero.,* 295 F.Supp.2d at 1196).

In 1996, Congress further broadened the statute by substituting the phrase "federal interest computer" with "protected computer." The Senate Report on these amendments states as follows:

> The proposed [§ ] 1030(a)(2)(C) is intended to protect against the interstate or foreign theft of information by computer. . . . This [section] would ensure that the theft of intangible information by the unauthorized use of a computer is prohibited in the same way theft of physical items are protected. *In instances where the information stolen is also copyrighted, the theft may implicate certain rights under the copyright laws. The crux of the offense under [§ ] 1030(a)(2)(C), however, is the abuse of a computer to obtain the information.*
>
> . . . .
>
> ... Those who improperly use computers to obtain other types of information—such as financial records, nonclassified Government information, and information of nominal value from pri-

---

7. The Court has fully considered the Defendants' argument that more recent decisions of district courts in the federal system reflect an evolving analysis favoring the narrow view of the CFAA, *see* note 6 *supra.* Given the Court's conclusion based upon the express terms of the statute, however, the Court has not found the more recent decisions to be dispositive.

vate individuals or companies—face only misdemeanor penalties, *unless the information is used for commercial advantage, private financial gain or to commit any criminal or tortious act.* For example, individuals who intentionally break into, or *abuse their authority to use,* a computer and thereby obtain information of minimal value of $5,000 or less, would be subject to a misdemeanor penalty. The crime becomes a felony if the offense was committed for *purposes of commercial advantage* or private financial gain, for the purposes of *committing any criminal or tortious act in violation* ... of the laws of the United States or of any State, or if the value of the information obtained exceeds $5,000. *Shurgard,* 119 F.Supp.2d at 1128–29 (omissions and emphasis in original) (quoting S.Rep. No. 104–357, at 7–8 (1996)). The *Shurgard* court concluded, "[t]his legislative history, although in reference § 1030(a)(2), demonstrates the broad meaning and intended scope of the terms 'protected computer' and 'without authorization' that are also used in the other relevant sections" of the CFAA, which supports the broad view of the statute. *Id.* at 1129.

The Court notes that the broad view does not focus on an employee's later misuse of information but rather focuses on an employee's initial *access* of the employer's computer with the intent to either obtain information or defraud the employer, thereby obtaining something of value. Thus, § 1030(a)(2)(C) "requires that a person intentionally access a computer without authorization and thereby obtain infor-

mation." *United States v. Willis,* 476 F.3d 1121, 1125 (10th Cir.2007). Section 1030(a)(4) requires "a person act with the specific intent to defraud," but can violate § 1030(a)(4) "by obtaining 'anything of value' by the unauthorized access," whereas § 1030(a)(2)(C) requires the person to obtain "information." *Id.* Both inquiries focus on a person's intent at the time of accessing the computer, not on a person's subsequent misappropriation of the information or thing of value obtained from the employer's computer.

Accordingly, the Court has previously and continues to analyze Artino's conduct under the broad view of the CFAA.

### 2. Prima Facie Case

#### a. Section 1030(a)(2)(C)

Section 1030(a)(2)(C) states in pertinent part as follows:

> Whoever ... intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains ... information from any protected computer if the conduct involved an interstate or foreign communication ... shall be punished as provided in [section] (c) of this section.

*Id.* § 1030(a)(2)(C).[8] NCMIC is required to prove three elements, by a preponderance of the evidence, to establish a cause of action under § 1030(a)(2)(C): (1) Artino's conduct involved interstate or foreign communication; (2) Artino used a "protected computer" in that it was used for interstate or foreign communication; and (3) Artino used NCMIC's computer to obtain

---

**8.** The parties do not argue that no civil cause of action can exist under §§ 1030(a)(2)(C) and 1030(a)(4). However, the Court rejects the argument that civil liability under § 1030(g) is limited to § 1030(a)(5)(A), *see Cenveo Corp. v. CelumSolutions Software GMBH & Co KG,* 504 F.Supp.2d 574, 580 (D.Minn.2007); rather § 1030(g) affords a civil action for any

CFAA provision if the plaintiff's allegation contains one of the five enumerated factors in § 1030(c)(4)(a)(i), *see Fiber Sys. Int'l v. Roehrs,* 470 F.3d 1150, 1157 (5th Cir.2006); *P.C. Yonkers,* 428 F.3d at 512–13; *Theofel v. Farey–Jones,* 359 F.3d 1066, 1078 n. 5 (9th Cir.2004).

information without authorization or exceeded his authorized access. *See Willis,* 476 F.3d at 1125 (elements of criminal statute under § 1030(a)(2)(C) do not require the intent to defraud as required under § 1030(a)(4)); *Diamond Power Int'l.,* 540 F.Supp.2d at 1341 n. 17 (interpreting the civil CFAA statute as requiring the plaintiff to prove a CFAA claim under §§ 1030(a)(2)(C) and (a)(4) by a preponderance of the evidence). Additionally, NCMIC must prove by a preponderance of the evidence that NCMIC suffered losses compensable under section 1030(c)(4)(A)(i).[9] *See Modis, Inc. v. Bardelli,* 531 F.Supp.2d 314, 318 (D.Conn. 2008) (stating a § 1030(a)(2)(C) claim requires the plaintiff to establish loss or damage under one of five § 1030(c)(4)(A)(i) factors).

 The first and second elements are not disputed. The term "protected computer" includes any computer "which is used in or affecting interstate or foreign commerce or communication." *Id.* § 1030(e)(2)(B). "As both the means to engage in commerce and the method by which transactions occur, the Internet is an instrumentality and channel of interstate commerce." *United States v. Trotter,* 478 F.3d 918, 921 (8th Cir.2007) (internal quotations omitted) (interpreting the criminal CFAA statute). Because NCMIC's computers were connected to the Internet, NCMIC's computers "were part of a system that is inexorably intertwined with interstate commerce and thus properly within the realm of Congress's Commerce Clause power." *Id.* (internal

quotations omitted). The fact that Artino's communications may have been limited to intrastate communications is not material to whether Artino accessed a protected computer. *Id.* (holding the location of the purported CFAA violation is not relevant because "[o]nce the computer is used in interstate commerce, Congress has the power to protect it from a local hammer blow, or from a local data packet that sends it haywire" (quoting *United States v. Mitra,* 405 F.3d 492, 496 (7th Cir.2005))).

 While the parties do not dispute that Artino obtained "information" from NCMIC's computer, the parties do dispute whether Artino was authorized to obtain this information from NCMIC. Under the broad view, the Court must determine whether Artino accessed proprietary business information from NCMIC's computer that Artino had permission to access but intended to use that information in a manner inconsistent with NCMIC's interests, thereby stripping Artino of any authority to access that information. *Citrin,* 440 F.3d at 420–21. In other words, the determinative question is whether Artino breached his duty of loyalty to NCMIC when Artino obtained information from NCMIC's computers. A breach of a duty of loyalty can terminate an agency relationship, and termination of that relationship makes the accessing of computer files that had previously been authorized transform into unauthorized access under the CFAA. *Citrin,* 440 F.3d at 420–21; *see also Midwest Janitorial Supply Corp. v.*

---

9. The factors listed in 18 U.S.C. § 1030(c)(4)(A)(i) are:

 (i) loss to 1 or more persons during any 1–year period ... aggregating at least $5,000 in value;

 (ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

 (iii) physical injury to any person;

 (iv) a threat to public health or safety; [or]

 (v) damage affecting a computer used by or for an entity of the U.S. Government in furtherance of the administration of justice, national defense, or national security.

*Greenwood,* 629 N.W.2d 371, 375 (Iowa 2001) (under Iowa law, a corporate officer owes a fiduciary duty of loyalty to their employer).

Artino served as NCMIC's vice president and general manager of its equipment-financing division. NCMIC's CFAA allegation occurred when Artino, acting as NCMIC's agent, accessed NCMIC's computer and e-mailed a customer spreadsheet containing NCMIC proprietary information to his personal e-mail account. This customer spreadsheet contained prospective customer's Social Security numbers and NCMIC's credit determination whether the customer was pre-approved for equipment financing and the amount of credit NCMIC could offer to each customer. Artino and Kerr used NCMIC's credit determination to assess the credit worthiness of prospective customers. The Court accepts Artino's testimony that he never provided these spreadsheets to LEAF; however, the Court also accepts Kerr's testimony that both he and Artino used NCMIC's spreadsheet to broker leases on LEAF's behalf. Kerr testified that he and Artino would divert leases from NCMIC to LEAF, including some leases that NCMIC had pre-approved for credit financing. Therefore, Artino's actions in accessing NCMIC's computer system to send e-mails aiding his unlawful competition with NCMIC and to obtain NCMIC's customer spreadsheet occurred without NCMIC's authorization and satisfy the third element of a § 1030(a)(2)(C) claim.

Because the Court adopts the broad view of the CFAA, most of Artino's other arguments regarding the third element fall short. While NCMIC could rest a CFAA claim based on breach of NCMIC's computer policy, *see EF Cultural Travel BV v. Zefer Corp.,* 318 F.3d 58, 62 (1st Cir.2003) (holding that an employee breached his confidentiality agreement with his ex-employer when the employee used confidential information he obtained as an employee to obtain information from his ex-employer's website thereby exceeding his authorized access in violation of the CFAA), NCMIC does not argue Artino acted in violation of NCMIC's computer policy. Rather, NCMIC argues Artino's CFAA liability is predicated on Artino's breach of fiduciary duty, which rendered Artino without authority to access NCMIC's customer spreadsheet. *Citrin,* 440 F.3d at 420–21. Additionally, while Artino undeniably had authority to access NCMIC's customer information while acting in his capacity as NCMIC's agent, "the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal," which occurred when Artino decided to compete against NCMIC and subsequently e-mailed NCMIC's customer spreadsheet to his personal e-mail account. *Shurgard,* 119 F.Supp.2d at 1126 (quoting Restatement (Second) of Agency § 112).

**b. Section 1030(a)(4)**

Section 1030(a)(4) states,

Whoever … knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value … shall be punished as provided in [section] (c) of this section.

*Id.* § 1030(a)(4). NCMIC is required to prove four elements, by a preponderance of the evidence, to establish a cause of action under § 1030(a)(4): (1) Artino accessed a "protected computer;" (2) Artino accessed NCMIC's computer without authorization or by exceeding authorized access; (3) Artino did so "knowingly" and with "intent to defraud;" and (4) Artino's

access "further[ed] the intended fraud and obtain[ed] anything of value." *See P.C. Yonkers,* 428 F.3d at 508. Additionally, NCMIC must prove by a preponderance of the evidence that NCMIC suffered losses compensable under § 1030(c)(4)(A)(i). *See Modis,* 531 F.Supp.2d at 318.

■ The Court determines that NCMIC satisfies the first two elements of a prima facie § 1030(a)(4) case: Artino accessed NCMIC's protected computer and did so without authorization. Regarding the third element, while the CFAA does not define "intent to defraud," the Eighth Circuit model jury instructions define the phrase under the mail fraud statute as requiring the defendant "to act knowingly and with the intent to deceive someone for the purpose of causing some financial loss to another or bringing about some financial gain to oneself or another to the detriment of a third party." Eighth Circuit Model Jury Instructions, Criminal 6.18.1341 (2007). Courts have interpreted "defraud" under the CFAA as meaning "wronging one in his property rights by dishonest methods or schemes." *Shurgard,* 119 F.Supp.2d at 1126 (citing *McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)) (interpreting mail fraud statute); *accord United States v. Czubinski,* 106 F.3d 1069, 1078 (1st Cir.1997) (holding that the CFAA's use of the word "defraud" "should apply to those who steal information through unauthorized access as part of an illegal scheme"). Under this standard, the Court finds Artino's conduct violated NCMIC's property rights when he accessed NCMIC's customer spreadsheet, e-mailed it from his work e-mail account to his personal e-mail account without authorization, and used the customer spreadsheet for his own personal gain and against NCMIC's financial interests. Kerr testified that while Artino was a NCMIC employee, Kerr met with Artino at least twelve times to discuss how to divert pre-

approved leases from NCMIC to LEAF in exchange for commissions paid by LEAF. Artino deceived NCMIC by not telling NCMIC of his plan to divert leases to LEAF in exchange for LEAF's commissions, which constitutes financial gain. These facts demonstrate that Artino committed these acts knowingly and with the intent to defraud NCMIC under the CFAA.

■ Artino also satisfies the last element because Artino obtained something of value, namely NCMIC's customer spreadsheet. Courts have defined "anything of value" under the CFAA as "[t]he value of information is relative to one's needs and objectives; here, the [plaintiff] had to show that the information was valuable to [the defendant] in light of a fraudulent scheme." *Czubinski,* 106 F.3d at 1078; *see Triad Consultants, Inc. v. Wiggins,* 249 Fed.Appx. 38, 41 (10th Cir.2007) (unpublished) (same definition of "anything of value"). The *Czubinski* court noted,

> The plain language of [§ ] 1030(a)(4) emphasizes that more than mere unauthorized use is required: the "thing obtained" may not merely be the unauthorized use. It is the showing of some additional end—to which the unauthorized access is a means—that is lacking here. The evidence did not show that [the defendant's] end was anything more than to satisfy his curiosity by viewing information about friends, acquaintances, and political rivals. No evidence suggests that he printed out, recorded, or used the information he browsed.

*Czubinski,* 106 F.3d at 1078. The Tenth Circuit made a similar observation, noting that § 1030(a)(4) requires that the defendant do more than merely access information without authorization: the defendant must obtain something of value from his unauthorized access of information, which requires the plaintiff to prove that the

defendant's "access to information was central to the claimed violation—[the plaintiff must prove] the information was either deleted, used to compete, or given to a competitor." *Triad Consultants,* 249 Fed.Appx. at 41. In this case, Artino clearly obtained something of value from his unauthorized access of NCMIC's customer spreadsheet. Artino testified that his company, PFG, was paid commissions of $169,205.51 by LEAF from transactions that occurred at the November 2006 trade show, where Artino used NCMIC's customer spreadsheet in part to identify which clients could receive financing from LEAF. Unlike the defendant in *Czubinski,* Artino (1) recorded NCMIC's customer spreadsheet for his personal use when he e-mailed it to his personal account, (2) printed the customer spreadsheet for use at the November 2006 trade show, and (3) actually used the customer spreadsheet at the November 2006 trade show for his financial gain. Accordingly, Artino's unauthorized access furthered his intended fraud and resulted in his obtaining something of value.

### 3. Damages

■ The CFAA's civil action provision states, "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *Id.* § 1030(g). As the plain language of the statute makes clear, only a person who has suffered "damage or loss" can maintain a cause of action. *Id.* The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030(e)(8). The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the

offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11).

This Court's Order of November 24, 2008, concluded that under the CFAA, NCMIC need only establish loss or damages, not both. Order of November 24, 2008, Clerk's No. 54 at 15–16 (citing *P.C. of Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore, LLC,* Civ. No. 04–4554, 2007 WL 708978, at *2, 2007 U.S. Dist. LEXIS 15216, at *5 (D.N.J. Mar. 2, 2007)). The Court agrees with Artino that NCMIC does not allege damage as defined by the CFAA. NCMIC does not allege "any impairment to the integrity or availability of data, a program, a system, or information," *id.* § 1030(e)(8), such as facts that would plausibly suggest that Artino's e-mailing of the customer spreadsheet caused a diminution in the completeness or usability of NCMIC's computerized data. *See Garelli Wong & Assocs., Inc. v. Nichols,* 551 F.Supp.2d 704, 710 (N.D.Ill.2008) (misappropriation of trade secrets alone does not constitute damage under the CFAA). Since Artino cannot prove the requisite amount of damages under the CFAA, if Artino cannot prove by the preponderance of evidence $5000 in losses during any one-year period, then Artino cannot recover under the CFAA. *See Theofel,* 359 F.3d at 1078 (holding the § 1030(c)(4)(A)(i) factors are jurisdictional).

If the plaintiff has suffered only "loss," the statute requires the plaintiff to satisfy the CFAA's jurisdictional threshold of "loss to 1 or more persons during any 1–year period ... aggregating [to] at least $5000 in value" to maintain a cause of action. *Id.* § 1030(c)(4)(A)(i)(I). Courts have interpreted "loss" to include the cost of responding to a security breach, such as the cost of performing a computer system damage assessment, even if the losses are

not derived from any change to the computers themselves or the information contained on the computer. *See EF Cultural Travel BV*, 274 F.3d at 584; *I.M.S. Inquiry Mgmt. Sys. v. Berkshire Info. Sys.*, 307 F.Supp.2d 521, 525–26 (S.D.N.Y.2004) (holding that "loss" includes the "damage assessment and remedial measures"). The CFAA's definition of loss is a "broadly worded provision plainly contemplat[ing] consequential damages of the type sought by [the plaintiff]—costs incurred as part of the response to a CFAA violation, including the investigation of an offense." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir.2009) (noting that "the costs of responding to the offense are recoverable including costs to investigate and take remedial steps" (internal quotations omitted)); *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F.Supp.2d 975, 980–81 (N.D.Cal.2008) (holding that "the cost of investigating and identifying the CFAA offense, including many hours of valuable time away from day-to-day responsibilities, causing losses well in excess of $5000, qualified as cost[s] of responding to an offense under § 1030(e)(11)." (internal quotations omitted)). The Senate Report on the 1996 amendments to the CFAA support this interpretation: "[when] the system administrator [must] devote resources to re-secur[e] the system ... although there is arguably no 'damage,' the victim does suffer 'loss.' If the loss to the victim meets the required monetary threshold, the conduct should be criminal, and the victim should be entitled to relief." *EF Cultural Travel BV*, 274 F.3d at 584 (quoting S.Rep. No. 104–357, at 11 (1996)). Other courts have relied on this legislative history to support losses incurred as a result of the plaintiff responding to the defendant's misappropriation of their data. *Id.* (holding the $20,944.92 the plaintiff paid "to assess whether their website had been compromised" was sufficient to satisfy the $5000 threshold); *Pac. Aero.*, 295 F.Supp.2d at 1196–97; *In re DoubleClick Inc. Privacy Litig.*, 154 F.Supp.2d 497, 521 (S.D.N.Y.2001); *Shurgard*, 119 F.Supp.2d at 1126–27.

While NCMIC does not allege Artino's conduct caused *damage* to NCMIC's computers, Eric Madcharo (Madcharo), NCMIC's chief information officer, testified about the following CFAA-related *losses* NCMIC incurred resulting from Artino's conduct: (1) $5831 for a damage assessment to determine the extent of Artino's security breach; (2) $3747.50 for legal research and assistance with remedial actions related to the security breach; and (3) $1614.50 for identity-theft-prevention services for individuals whose Social Security numbers Artino obtained without NCMIC's permission. The total cost of NCMIC's remedial action and investigation into Artino's conduct was $11,193.

Madcharo testified that when NCMIC first learned that Artino e-mailed NCMIC's customer spreadsheet from his NCMIC account to his personal account, NCMIC asked Madcharo to investigate the extent of Artino's disclosure of Social Security numbers and credit information to third parties. Madcharo testified that he spent fifty hours searching the e-mail accounts of Artino, Kerr, and Sally Schmaltz to determine the extent of the disclosure since all three were involved in the formation and operation of PFG. NCMIC valued Madcharo's time investigating this matter at $5831.[10] Madcharo

---

10. NCMIC calculates Madcharo's hourly rate at $116.63 by taking his salary divided by 2,015 hours. *See United States v. Millot*, 433 F.3d 1057, 1061 (8th Cir.2006) (calculating the amount of loss under the CFAA by an employee conducting a damage assessment using a formula of the employee's hourly rate multiplied by the hours worked on the damage assessment was reasonable because the employee's hours spent addressing the issues

testified that only Artino sent this information to a non-NCMIC computer. The Court acknowledges that fifty hours is a considerable amount of time for a damage assessment. Artino did not present any evidence that, under the circumstance of this case, Madcharo's time investment was unreasonable or that Madcharo's reported time was not used for the purpose of conducting a damage assessment in response to Artino's conduct. *See Patrick Patterson Custom Homes, Inc. v. Bach,* 586 F.Supp.2d 1026, 1036 (N.D.Ill.2008) (concluding that under the CFAA, "costs are recoverable regardless of whether there is an interruption of service, and courts have sustained actions based on allegations of costs to investigate and take remedial steps in response to a defendant's misconduct"); *cf. Nexans Wires S.A. v. Sark–USA, Inc.,* 319 F.Supp.2d 468, 476 (S.D.N.Y.2004) (rejecting the plaintiff's claim that travel time constituted loss under the CFAA because (1) "the affidavits do not allege any facts showing that this assessment or response was in any way related to a computer"; (2) "nothing suggests that the trips were taken to engage in any type of computer investigation or repair"; and (3) "no facts are alleged showing that preventive measures were added to the computers or that the system was augmented to tighten security—after all, these were discussions between senior executives-not computer experts"). The Court considers Madcharo's time as recoverable under the CFAA.

NCMIC also retained counsel to survey federal and state law to determine whether NCMIC had any obligation to report the disclosure of the Social Security numbers or to notify the victims of the disclosure. Cole testified that NCMIC officers believed they had a duty to report Artino's conduct under various state laws. The cost of counsel's investigation and reporting assistance totaled $3747.50. As a result of its investigation, NCMIC determined it had to notify approximately sixty-nine individuals, in several different states, of the security breach. NCMIC sent letters to each individual and to the attorney general's office of three states. NCMIC purchased identity-theft-prevention services for the sixty-nine affected individuals. Thirty-eight of the affected individuals were NCMIC policy holders. The identity-theft-prevention services for one year cost NCMIC $3.75 per person, for a total of $142.50. The cost of the identity-theft-prevention services for thirty-two of the affected individuals who were not NCMIC policy holders was $46 per person, for a total of $1472. Thus, NCMIC paid a total of $1614.50 to purchase identity-theft-prevention services for the affected individuals. Both of these types of losses are recoverable under the CFAA because they are "reasonable cost[s] to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense," and these costs were incurred as a result of Artino's conduct. *Id.* § 1030(e)(11). If Artino did not use NCMIC's customer spreadsheet in an unauthorized manner, NCMIC would not have been required to respond to the improper use of Social Security numbers by incurring attorneys' fees and paying for identity-theft-prevention services for NCMIC clients. Although attorneys' fees in prosecuting a CFAA action do not count toward the $5000 statutory threshold, *see Wilson v. Moreau,* 440 F.Supp.2d 81, 110 (D.R.I.2006), attorneys' fees incurred responding to the actual CFAA violation to place the plaintiff in their *ex ante* position are permissible as costs "incurred as part of the response to a CFAA violation, in-

caused by the defendant's unauthorized ac-

cess could have been spent on other duties).

cluding the investigation of an offense." *A.V. ex rel. Vanderhye,* 562 F.3d at 646.

NCMIC has proved by the preponderance of the evidence that Artino violated CFAA §§ 1030(a)(2)(C) and 1030(a)(4) and owes NCMIC $11,193 resulting from NCMIC's losses incurred as a result of Artino's unauthorized access of NCMIC's customer spreadsheet using NCMIC's computer.

### B. Count Two: Breach of Contract Against Artino

NCMIC argues that Artino breached the restrictive covenants contained in his Employment Agreement preventing Artino from competing with NCMIC for eighteen months following termination of Artino's employment. Artino resists and advances two affirmative defenses providing legal justification for his breach: NCMIC's unclean hands and breach of an implied duty of good faith and fair dealing.

### 1. Language of the Agreement

At the time Artino was hired by NCMIC, Artino signed an Employment Agreement concerning the disclosure of confidential information and non-competition with NCMIC. The Employment Agreement included the following relevant provisions:

6. *Confidential Information.*

(a) Employee acknowledges and agrees that it is necessary for the Company to prevent the unauthorized use and disclosure of Confidential Information (as that term is defined below) regarding the Company and its services, products and business. Accordingly, and in further consideration for this Agreement, Employee covenants and agrees that Employee will not, during the term of this Agreement or at any time thereafter (whether this Agreement is terminat-

ed by the Company, by Employee or by mutual consent, and for whatever reason or for no reason), directly or indirectly, engage in or take any action or inaction which may in any way lead to the use or disclosure of any Confidential Information by or to any person, nor use or disclose any such Confidential Information for Employee's own benefit, excepting only such limited uses or disclosures by Employee during the term of this Agreement which are within the limited authority expressly granted to Employee by this Agreement.

(b) For purposes of this Agreement, the term "Confidential Information" means all information in any form which is proprietary or confidential to the Company, whether regarding its services, products, business or otherwise, and whether received, obtained, compiled, developed or prepared by Employee before or after the date hereof and whether or not designated as such when received or obtained by Employee. "Confidential Information" shall include, but not be limited to, the following information and/or types of information:

. . .

(iv) customers, customer lists, prospects or market research data, and other customer information such as renewal rate and price information;

. . .

8. *Noncompetition.*

(a) As further consideration for this Agreement, Employee covenants and agrees that during the term of this Agreement and for a period of 18 months thereafter (whether this Agreement is terminated by the Company, by Employee, or by mutual consent, and for whatever reason or for

no reason), Employee will not, directly or indirectly:

(i) accept other employment or any other engagement, appointment or association (including consulting) of any nature whatsoever with, or become an investor or otherwise interested or concerned in or with, any person of any nature whatsoever which person is a competitor, directly or indirectly, of the Company in the development, marketing, promotion, distribution, sale or offering of, or which otherwise deals with or offers, any goods, products or services which are competitive in any way with any of the goods, products or services of the Company; or

(ii) engage in any other activity whatsoever (whether on Employee's own account or for another) which is competitive with or detrimental to the Company in the operation of its businesses, including, without limitation, soliciting any customers of the Company, or any person who was a customer of the Company at any time within one (1) year prior to the termination of this Agreement, for purposes of offering any goods, products or services which are competitive in any way with any of the goods, products or services of the Company.

(b) Employee acknowledges and agrees that to limit the covenants set forth in this Section 8 to specific persons or to any specific location or geographic area would prevent the Company from adequately protecting its bona fide and justifiable business interests, and would frustrate the intent of both Employee and the Company as to this Section 8.

Ex. 1 at 4–7.

The Severance Agreement required NCMIC to pay Artino his base salary for eighteen months after separation from NCMIC. The Severance Agreement states, "Only those Executives whose Employment Agreements have been terminated 'without cause' by NCMIC ... are eligible for the benefits of the Plan. An Executive is not eligible for the benefits of the Plan if his ... Employment Agreement is terminated under ... (2) by NCMIC ... 'for cause' under Section 10(b)." Ex. 2. "For cause" is defined in the Severance Agreement as requiring Artino's "(1) violation or breach of any term or condition of the Employment Agreement...." *Id.* The Severance Agreement also states that Artino is not eligible for severance payments if he is terminated under Section 10(d) of the Employment Agreement, which states that "[Artino] may terminate this Agreement at any time, with or without cause, for any reason or no reason, effective thirty (30) days after the giving of written notice of such intent to [NCMIC]. Such notice shall be deemed to be [Artino's] resignation from employment." Ex. 1 at 8. Despite Artino's resignation under Section 10(d) of the Employment Agreement, NCMIC paid Artino eighteen months severance pay under the Severance Agreement.

The Goodwill Agreement required NCMIC to pay Artino "an amount equal to the amount earned [under the Goodwill Agreement] by [Artino] solely under this Agreement in the immediately preceding eighteen (18) months within ninety days of such termination." Ex. 3 at 2. However, the Goodwill Agreement conditions any goodwill payments on Artino being "terminated solely without cause." *Id.*

## 2. Applicable Law

■ The complaining party in a breach of contract action must prove the following elements: "(1) the existence of a contract;

(2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach." *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

 Iowa law applies a three-part test to determine whether a non-compete restrictive covenant in an employment contract is enforceable: "(1) Is the restriction reasonably necessary for the protection of the employer's business; (2) is it unreasonably restrictive of the employee's rights; and (3) is it prejudicial to the public interest?" *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 761 (Iowa 1999) (citing *Lamp v. Am. Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986)). Courts "will enforce a noncompetitive provision in an employment contract if the covenant is reasonably necessary for the protection of the employer's business and is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest." *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983). However, "[c]ovenants not to compete are unreasonably restrictive unless they are tightly limited as to both time and area." *Id.* (quoting *Lemmon v. Hendrickson*, 559 N.W.2d 278, 282 (Iowa 1997)). "Factors we consider in determining the enforceability of a noncompete agreement include the employee's close proximity to customers, the nature of the business, accessibility to information peculiar to the employer's business, and the nature of the occupation which is restrained." *Revere Transducers*, 595 N.W.2d at 761 (citing *Jindrich*, 338 N.W.2d at 382). However, "[a]n employee cannot be precluded from exercising the skill and general knowledge [the employee] has acquired or increased through experience or even instruction while in the employment." *Jindrich*, 338 N.W.2d at

383. The Iowa Supreme Court has articulated a framework for determining the reasonableness of a restrictive non-compete covenant:

> Essentially, [this rule requires] us to apply a reasonableness standard in maintaining a proper balance between the interests of the employer and the employee. Although we must afford fair protection to the business interest of the employer, the restriction on the employee must be no greater than necessary to protect the employer. Moreover, the covenant must not be oppressive or create hardships on the employee out of proportion to the benefits the employer may be expected to gain.

*Id.*

 Iowa law considers restrictive covenants associated with the sale of a business presumptively more reasonable than stand-alone employment agreements. *Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224, 1258 (N.D.Iowa 1995) (applying Iowa law) (citing *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 369 (Iowa 1971)).

 An employer can decide not to pursue a particular customer or line of business and thereby abandon its rights under a non-compete restrictive covenant as to that customer or line of business. *See Jindrich*, 338 N.W.2d at 380. "Abandonment of a contract is the relinquishment, renunciation or surrender of a right. Its existence depends upon intention and acts evidencing intention to abandon. The act of relinquishment must be unequivocal and decisive." *Id.* The party asserting abandonment of a valid contract can demonstrate abandonment through the "express agreement of the parties, or the parties, by conduct inconsistent with the continued existence of the original contract, may estop themselves from asserting any right thereunder." *Id.*

### 3. Artino's Breach of the Restrictive Covenant

Beginning in August 2006, Artino and Kerr entered into discussions to establish PFG for the purpose of diverting PSI leases from NCMIC to LEAF in consideration for LEAF paying PFG commissions. During November 2006, Artino and Kerr booked PSI leases for LEAF even though both Artino and Kerr were still NCMIC employees. Artino and Kerr used NCMIC's resources to finalize these transactions. The evidence does not indicate that either Artino or Kerr obtained permission from NCMIC management to book these leases on LEAF's behalf. *See Presto-X-Co. v. Ewing*, 442 N.W.2d 85, 89 (Iowa 1989) (concluding the employee breached his restrictive covenant to not compete because the employee was "prohibited ... from either soliciting or servicing his former [employer's] customers in any direct or indirect way").

On December 1, 2006, Artino resigned from NCMIC but continued to book PSI leases with LEAF after his resignation. In February 2007, Artino and Kerr entered into negotiations with Pisciottano about selling PFG to PSI and becoming PSI's exclusive leasing source. Artino booked many leases with LEAF after December 1, 2006, which supports the conclusion that Artino intended to compete against NCMIC even after Artino had resigned from NCMIC, and not that Artino was merely following NCMIC's orders to find another outlet for PSI. The Court finds by a preponderance of the evidence that Artino's conduct, beginning in August 2006 when Artino began discussions to establish PFG, breached his non-compete restrictive covenant with NCMIC discussed in Section 8(a) of Artino's Employment Agreement. *See Jindrich*, 338 N.W.2d at 381 (holding that an employer can demonstrate breach of an enforceable non-compete restrictive covenant if the former employee "pirated or had the chance to pirate part of [the employer's] business; took or had the opportunity of taking some part of the good will of the [the employer's] business, or it can reasonably be expected some of the patrons or customers [the employee] served while in [the employer's] employment will follow [the employee] to the new employment").

Artino argues that even though the non-compete agreement is a valid contract, NCMIC abandoned it to enforce the non-compete agreement with respect to PSI's business at the November 2006 trade show. *See id.* at 380 (recognizing that a party can abandon a restrictive covenant by transferring an employee to a different geographic location but holding that the employer did not abandon its restrictive covenant with the employee). Unlike *Iowa Glass Depot, Inc. v. Jindrich,* which discussed whether an employer could abandon certain geographic territory discussed in a non-compete agreement, *id.* at 381, Artino asserts that NCMIC abandoned its rights regarding certain leases booked with PSI. Artino, citing the Ohio Court of Appeals cases *Premier Assocs., Ltd. v. Loper,* 149 Ohio App.3d 660, 778 N.E.2d 630 (2002), and *Premier Health Care Servs., Inc. v. Schneiderman,* No. 18795, 2001 WL 1658167 (Ohio Ct.App. Dec. 28, 2001) (unpublished), argues that an employer can partially abandon its right to certain customers if the employer turns away business from that employer. However, both *Loper* and *Schneiderman* involve (1) employers who completely abandoned specific customers, instead of limiting their sales volume to specific customers; and (2) situations where enforcement of a non-compete agreement would result in harm to medical patients rendering the covenant unreasonable to the public interest, instead of a non-compete agreement involving commercial interests.

The Court finds no Iowa authority supporting Artino's claim that an employer's abandonment of specific customers renders a non-compete restrictive covenant unenforceable and finds no authority from any jurisdiction supporting Artino's theory of partial abandonment of a specific customer that renders a non-compete restrictive covenant unenforceable.

In arguing NCMIC abandoned its PSI business, Artino cites several e-mail exchanges between Cole and Artino as evidence of abandonment. On May 24, 2006, Cole e-mailed Artino stating that NCMIC "need[s] to focus heavily on non[-chiropractor] business as it will come in anyway, and also slow down [PSI]. [PSI] should have more than one funding source regardless and our exposure should not exceed $15 to $20M as we previously discussed." Ex. PP. On July 27, 2006, Cole e-mailed Artino stating that "lets [sic] target a maximum of $20 million to be held on our books and shoot for sales at least twice each year to stay at or below the $20 million level." Ex. 55. On August 11, 2006, Cole e-mailed Artino that "maybe the best option then is to tell [Pisciottano] he has to develop other outlets asap as we cannot be his primary funding source simply due to the concentration it presents." Ex. UU. On November 3, 2006, Cole e-mailed Artino, "please get with [Pisciottano] **ASAP** and find another outlet for the upcoming convention business. Regardless of what we do with the sale, I do not want to load up with pre approvals or a ton of paper coming in. Lets [sic] limit our purchases to no more than $7M tops between now and year end." Ex. H. On November 8, 2006, Cole e-mailed Artino to be more "selective" on which PSI leases he books and that Artino could only book $10 million in PSI leases. Ex. 54.

Artino interpreted Cole's November 3 e-mail as limiting the total volume of PSI leases NCMIC could book to $7 million, which Artino believed was the average amount of leasing volume that NCMIC would generate if it did not attend the November 2006 trade show. Artino testified that Cole told him that after he resigned, he "should just go to work for [Pisciottano]." Tr. 410. Cole denies making this remark, and there is no written evidence corroborating Artino's statement. However, Cole clearly communicated to Artino prior to the November 2006 trade show that NCMIC wanted to book $10 million in PSI leases and that Artino should exercise discretion by selecting the most credit-worthy applicants to satisfy the $10 million cap. If PSI needed assistance beyond the $10 million in leases that NCMIC was capable of underwriting, then Artino was instructed to help place those additional, less desirable leases with other lenders. Artino has pointed to no written evidence from NCMIC that Artino was not supposed to book PSI leases on NCMIC's behalf at the November 2006 trade show. In between Cole's e-mail of November 3 and his later e-mails of November 8 and 9, NCMIC remained in communication with PSI about pre-approvals for the November 2006 trade show, indicating that NCMIC was always interested in business from the November 2006 trade show. At best, the written evidence indicates that NCMIC had concerns about exceeding $10 million in PSI leases during November and December 2006 and sought to suggest to PSI that if they had more than $10 million in leases they needed to underwrite, PSI should find other financing sources. There is no written evidence that (1) NCMIC authorized Artino to book PSI leases on LEAF's behalf at the November 2006 trade show, (2) NCMIC did not authorize Artino to book PSI leases on NCMIC's behalf at the November 2006 trade show, or (3) NCMIC told Artino that he could keep any commissions for himself that were booked as part of finding "anoth-

er outlet" for PSI leases. The only evidence in the record supporting this claim is Artino's own testimony, which is discredited by the e-mails from Cole to Artino authorizing Artino to book up to $10 million in PSI leases for NCMIC. While Artino may have subjectively believed that he was not competing with NCMIC, Artino did not have permission to compete against NCMIC, whether it was through booking PSI leases for LEAF or creating PFG to compete against NCMIC. Additionally, the twelve discussions between Kerr and Artino while both were NCMIC employees beginning in August 2006 supports the conclusion that Artino's intent was to compete against NCMIC beginning in August 2006.

Artino attended the November 2006 trade show as a NCMIC employee to help book PSI leases on NCMIC's behalf. In fact, NCMIC wrote approximately $2.5 million in PSI leases at the November 2006 trade show, which is strong evidence that NCMIC did not abandon booking PSI leases at the November 2006 trade show. NCMIC did not exceed either the $7 million or the $10 million cap on PSI leases, meaning NCMIC would not have turned down some of the leases that Artino diverted to LEAF.

Artino argues that some NCMIC officials openly questioned the efficacy of the ProAdjuster, which supports Artino's claim that NCMIC was not interested in booking additional PSI leases. However, the record clearly contradicts such an assertion because NCMIC booked PSI leases at the November 2006 trade show and additional leases in 2007. Thus, even if Artino is correct that certain NCMIC employees were suspicious of PSI's business practices, NCMIC continued to book PSI leases despite these reservations.

Artino's proffered explanation for booking PSI leases on behalf of LEAF is inconsistent with NCMIC abandoning PSI leases. Artino attended the November 2006 trade show as a NCMIC officer and representative. However, Kerr testified that Artino and Kerr had reached an agreement with LEAF regarding commissions for PSI leases booked at the November 2006 trade show, and Artino admits that at a minimum they were in negotiations with LEAF before attending the trade show, and it was implied that Artino would receive compensation for his efforts on LEAF's behalf. Artino never engaged in any written communications with NCMIC indicating his desire to book leases on behalf of LEAF at the November 2006 trade show, despite the fact that Artino admitted he was trying to keep a meticulous "paper trail" to make sure his actions would not result in legal complications after his resignation.

Artino's Employment Agreement states that "[n]o amendment, modification ... or waiver of or to any provision of this Agreement, or consent to any departure therefrom, shall be effective unless the same shall be in writing and signed by or on behalf of the party to be charged with the enforcement thereof." Ex. 1 at 10. There was no evidence in the record presented at trial that Artino and NCMIC amended the non-compete agreement to permit Artino to conduct PSI business on behalf of LEAF.

The Court finds by the preponderance of the evidence that NCMIC had a financial interest in continuing to book PSI leases and did not intend to abandon PSI at the November 2006 trade show. The Court further finds that NCMIC did not "unequivocally and decisively relinquish[ ] their rights under the covenant" by renouncing or surrendering its right to book PSI leases, meaning NCMIC never abandoned its right to book PSI leases. *Jindrich*, 338 N.W.2d at 380.

### 4. Enforceability of Restrictive Covenant

■■■■ The next question is whether the restrictive covenant is enforceable as applied under Iowa law. *Revere Transducers,* 595 N.W.2d at 761. An enforceable non-compete restrictive covenant must be reasonably necessary to protect the employer, place a reasonable restriction on the employee, and not harm the public interest. *Id.*

#### a. Employer's Protectable Interest

■■■ Iowa law permits enforcement of a non-compete restrictive covenant when it is reasonably necessary to protect the employer's interest in preventing the employee from pirating the employer's customers. *Jindrich,* 338 N.W.2d at 382 ("In justifying restraints enforced against an employee, we have often relied upon the employee's close proximity to customers along with peculiar knowledge gained through employment that provides a means to pirate the customer."). To satisfy this requirement, there must be "some showing that defendant, when he left plaintiff's employment, pirated or had the chance to pirate part of plaintiff's business; took or had the opportunity of taking some part of the good will of the plaintiff's business, or it can reasonably be expected some of the patrons or customers he served while in plaintiff's employment will follow him to the new employment." *Dental East, P.C. v. Westercamp,* 423 N.W.2d 553, 555 (Iowa Ct.App.1988).

Artino was the vice president of NCMIC's equipment-financing division and was the primary point of contact with PSI and other vendors and suppliers who were sources for further referrals for lease transactions. Artino had access to all of NCMIC's competitive information, including business plans, marketing plans, sales strategies, and other confidential and proprietary information. NCMIC entrusted Artino with substantial responsibility by appointing him vice president of the equipment-financing division. Given Artino's position and influence in the equipment-financing division, NCMIC had a protectable interest in preventing Artino from using the goodwill, client relations, and confidential customer lists that were obtained through NCMIC expenditures. Courts have routinely found non-compete restrictive covenants reasonable under these circumstances. *See, e.g., Pro Edge, L.P. v. Gue,* 374 F.Supp.2d 711, 740–41 (N.D.Iowa 2005) (applying Iowa law); *Moore Bus. Forms, Inc. v. Wilson,* 953 F.Supp. 1056, 1062 (N.D.Iowa 1996) (same). There is a strong presumption that non-compete restrictive covenants are enforceable when accompanying the sale of a business, and the restrictive covenant preventing Artino from competing against NCMIC for eighteen months arose out of Artino selling PCG to NCMIC. *See Ehlers,* 188 N.W.2d at 369 (holding Iowa law has a strong presumption that restrictive covenants accompanying the sale of a business are enforceable).

#### b. Reasonable Restriction on Employee

Artino's Employment Agreement required that Artino not compete or solicit NCMIC customers for eighteen months. Eighteen months is not an unreasonable period of time since Iowa law has recognized restrictive covenants lasting more than eighteen months. *See Lemmon,* 559 N.W.2d at 282 ("The two-year non-competition period agreed to in the employment contract is reasonable, but [the employer's] attempt to enforce the agreement beyond that time period is not."); *Presto–X–Co.,* 442 N.W.2d at 88–89 (enforcing two-year non-solicitation restrictive covenant of the employer's clients). The eighteen month non-compete and non-solicitation clauses are enforceable against Artino based on

Artino's sale of PCG to NCMIC, the negotiated compensation structure including eighteen months severance pay, and Artino's informed decision based on his consultation with his attorney before agreeing to the restrictive non-compete agreement.

### b. Public Interest

Iowa law recognizes the enforceability of non-compete restrictive covenants in employment agreements involving routine commercial transactions. *See, e.g., Presto–X–Co.*, 442 N.W.2d at 88–89; *Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 449–50 (Iowa Ct.App.1992). Artino has not made any arguments that the restrictive covenants contained in the Employment Agreement involving equipment leasing would violate any public interest.

Accordingly, the Court concludes that the three-part test supports enforcing the restrictive covenants contained in the Employment Agreement.

### 5. Affirmative Defenses

### a. Unclean Hands

Artino argues that NCMIC's actions caused Artino to breach the Employment Agreement, which permits Artino to assert the "unclean hands" defense against NCMIC, prohibiting any recovery or relief by NCMIC under the Employment Agreement.

■ The doctrine of unclean hands considers whether the party seeking relief has engaged in inequitable conduct that has harmed the party against whom he seeks relief. *Gen. Car & Truck Leasing Sys., Inc. v. Lane & Waterman*, 557 N.W.2d 274, 279 (Iowa 1996). The doctrine stands for the principle that a party may be denied relief in equity based on their inequitable, unfair, dishonest, fraudulent, or deceitful conduct. *Ellwood v. Mid States Commodities, Inc.*, 404 N.W.2d 174, 184 (Iowa 1987).

■ The Court concludes that NCMIC's conduct towards Artino does not warrant application of the "unclean hands" defense. While Cole told Artino to find "another outlet" for PSI lease transactions in excess of $10 million, Cole never authorized Artino to (1) collect commissions from LEAF for work performed as a NCMIC employee, or (2) compete against NCMIC's interests both during and after Artino's employment. If Artino believed NCMIC was in breach of any of the agreements he signed when he sold PCG to NCMIC, Artino could initiate a legal action against NCMIC for breach of contract. However, Artino resorted to self-help and breached his non-compete restrictive covenant with NCMIC. Accordingly, the Court finds that NCMIC's conduct does not warrant application of the unclean hands defense.

### b. Implied Duty of Good Faith and Fair Dealing

■ Artino also argues that NCMIC breached an implied duty of good faith and fair dealing contained in the Employment Agreement with Artino. The Iowa Supreme Court "[has] consistently rejected that theory in employment contract cases." *Porter v. Pioneer Hi–Bred Int'l, Inc.*, 497 N.W.2d 870, 871 (Iowa 1993). Artino's citation of *Nelson v. Long Lines Ltd.*, No. C02–4083–MWB, 2003 WL 21356081 (N.D.Iowa June 11, 2003), does not change the result. In *Nelson*, then-Chief Judge Mark W. Bennett found on a motion to dismiss procedural posture that "there is a distinction, though perhaps subtle, between an employer allegedly breaching the covenant of 'good faith and fair dealing' in the termination of an at-will employee and the treatment, i.e., the alleged breaching of a covenant of 'good faith and fair dealing' of a contract with said employee 'during' the term of his employment." *Id.* at *8. However, on a motion for summary judg-

ment, Judge Bennett concluded that this was a distinction without a difference under Iowa law and dismissed the plaintiff's breach of implied duty of good faith and fair dealing claim, holding

> In light of the Iowa Supreme Court's repeated and categorical refusal to recognize a cause of action for breach of an implied covenant of good faith and fair dealing in employment situations, the court does not believe that [the plaintiff's] breach of good faith and fair dealing claim provides any basis for this federal court to assume that the Iowa Supreme Court would recognize such a cause of action. The court, therefore, declines to take such a bold departure from Iowa law of recognizing a claim for breach of an implied covenant of good faith and fair dealing in the employment context. Defendants are therefore entitled to summary judgment on [the plaintiff's] claim of breach of covenant of good faith and fair dealing. Thus, defendants' Motion For Summary Judgment on this issue is also granted.

*Nelson v. Long Lines Ltd.,* 335 F.Supp.2d 944, 968 (N.D.Iowa 2004). The Court agrees with this reasoning and concludes that Iowa law does not recognize this defense as applied to the facts of this case. Assuming *arguendo* the availability of this affirmative defense, the facts would fall short as they do on the clean hands defense.

### 6. Damages

■ The Court concludes NCMIC is entitled to lost profits caused by Artino's breach of the Employment Agreement's non-compete restrictive covenant. *Presto–X–Co.,* 442 N.W.2d at 90; *Orkin Exterminating Co. v. Burnett,* 160 N.W.2d 427, 429 (Iowa 1968) ("The measure of the damages resulting from the wrongful breach of an agreement not to compete is the loss naturally resulting from the breach, including loss of profits.").

Rona Seams (Seams), NCMIC's expert at damages calculations in commercial disputes, estimated that NCMIC incurred lost profits of $436,384.00 as a result of Artino diverting leases to LEAF. Seams reached this conclusion by taking a list of all PSI leases Artino booked on LEAF's behalf, comparing that list with the PSI leases that the customer spreadsheet indicated NCMIC would underwrite, and calculating the PSI lease volume lost and the profit NCMIC would have received from those PSI leases because of the interest rate spread. Seams testified that she reduced these gross revenue receipts by expenses associated with that revenue. Seams further testified that she discounted these amounts over five years to reflect that lease profits are received over the five-year lease duration to calculate NCMIC's weighted average costs of capital and funding, which was 7.44% discount rate.

Even though some LEAF leases defaulted, that does not affect Seams' lost profits calculations. NCMIC and PSI had a reserve program that provided NCMIC protection from bad debt losses from defaults on leases. If the reserve account was ever inadequate, PSI had to reimburse NCMIC for any lost revenue. The Court concludes that these estimates are reasonable, and NCMIC is entitled to lost profits damages in the amount of $436,384.00.

The Court concludes that NCMIC is entitled to recover the severance payments paid to Artino on December 8, 2006, due to Artino's material breach of his Employment Agreement. The Severance Agreement requires NCMIC to pay Artino if he has been terminated "without cause." Ex. 2. However, the severance pay plan defines "for cause," *inter alia,* as "violation or breach of any term or condition of the Employment Agreement." *Id.* Iowa law permits NCMIC to recover payments al-

ready made to Artino. *See AMPC, Inc. v. Meyer,* No. 02–06023, 669 N.W.2d 262, 2003 WL 21459665, at *3 (Iowa App.2003) (per curiam) (unpublished table opinion) (ordering recovery of the employee's severance payments made by the employer based on the employee's material breach of the non-compete restrictive covenant). In order to determine the materiality of a breach, the Iowa Supreme Court has adopted the Restatement (Second) of Contracts approach, which

> [looks] to the injured party and asks to what extent that party will be deprived of the benefit it reasonably expected, account being taken of the possibility of adequate compensation for that part. It also looks to the other party—to the possibility that it will suffer forfeiture, to the likelihood that it will cure its failure, and to the degree that its behavior comported with standards of good faith and fair dealing. Most significant is the extent to which the breach will deprive the injured party of the benefit that it justifiably expected.

*Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.,* 599 N.W.2d 684, 692 (Iowa 1999) (quoting II E. Allan Farnsworth, *Farnsworth on Contracts* § 8.16, at 496–97 (2d ed.1998) (citing Restatement (Second) of Contracts § 241)).

The non-compete restrictive covenant was negotiated, along with the Severance Agreement, to provide Artino compensation during the period of non-competition by Artino against NCMIC. The benefit reasonably expected by NCMIC was that it would not have any competition from Artino, and NCMIC was deprived of this benefit when Artino formed PFG and began booking leases for NCMIC's competitors. *See Van Oort Constr. Co.,* 599 N.W.2d at 692 (holding the non-compete agreement was the only purpose supporting installment payments to the former employee); *cf. West v. Jayne,* 484 N.W.2d 186, 189 (Iowa 1992) (holding that breach

was not material to excuse the other party's performance because the breach constituted a minor portion of the promised performance). Artino received payments under the Severance Agreement. NCMIC can also prove the amount of loss with sufficient certainty that will adequately compensate Defendant for the benefit that Artino's non-competition would have provided; in this case, $191,250 in severance payments under the Severance Agreement. NCMIC has already performed under the contract based on their expectation that Artino would not compete against NCMIC, which means NCMIC will have forfeited the $191,250 in severance payments if it is not allowed to recover those damages. There is no way for Artino to cure this breach except through returning the severance payments. Accordingly, the Court finds by a preponderance of the evidence that Artino materially breached the Severance Agreement by violating the non-compete restrictive covenant contained in the Employment Agreement and owes $191,250 in damages to NCMIC.

The Court concludes that NCMIC is not entitled to recover the goodwill payments paid to Artino on December 8, 2006, under the Goodwill Agreement because Artino did not materially breach the Goodwill Agreement. NCMIC realized the benefit of the Goodwill Agreement in the months and years following the sale of PCG to NCMIC, and that benefit had been fully realized when Artino resigned from NCMIC. Unlike the Severance Agreement, the Goodwill Agreement by its express terms is not an employment agreement and was made for "all of [Artino's] personal goodwill as it relates to the business and operations of PCG." Ex. 3. Unlike the Severance Agreement, which was made for the sole purpose of providing compensation for Artino during the eighteen-month non-compete restrictive covenant period, and thereby made Artino's

subsequent competition with NCMIC a material breach, the Goodwill Agreement was made in contemplation of NCMIC's purchase of PCG and was designed to provide incentives to generate business as a NCMIC employee. *See Meyer*, 2003 WL 21459665, at *3 (permitting the employer to recoup severance payments made to an employee because the "sole purpose in giving [the employee] the severance payments (to which he was not otherwise entitled) was to ensure that he would honor his non-competition covenants.... The purpose of the severance agreement was to ensure that [the employee] understood the covenant not to compete would be recognized to be in full force"). Cole admitted that the Goodwill Agreement and the payments required under it were compensation for the sale of PCG. Cole testified that the primary asset NCMIC purchased was the "intellectual knowledge that [Artino] brought to the table." This is further corroborated by Artino receiving only $60,000 for the sale of PCG and that Artino and NCMIC agreed to structure the transaction so that Artino would receive the majority of the proceeds from the sale in the Goodwill Agreement for tax reasons. While the Court recognizes that Artino breached the Goodwill Agreement by competing against NCMIC, the Court concludes Artino's conduct does not constitute a material breach of the Goodwill Agreement and does not excuse NCMIC from paying Artino $467,820 under the Goodwill Agreement. Accordingly, the Court finds by a preponderance of the evidence that Artino did not materially breach the Goodwill Agreement, and therefore NCMIC is not entitled to any relief under the Goodwill Agreement.

## C. Count Three: Misappropriation of Trade Secrets Against Artino

 NCMIC argues that Artino misappropriated NCMIC's trade secrets.[11] In Iowa, the tort of misappropriation of trade secrets arises from both statute and common law. *See* Iowa Code § 550; *Lemmon*, 559 N.W.2d at 280. The trade secret's owner may recover damages for misappropriation of its trade secrets. *Id.* § 550.4(1). To succeed on its misappropriation of trade secrets claim against Artino, NCMIC must prove by the preponderance of the evidence three elements: "(1) [the] existence of a trade secret, (2) [the] acquisition of the secret as a result of a confidential relationship, and (3) [the] unauthorized use of the secret." *Lemmon*, 559 N.W.2d at 279. The elements of the statutory and common law claims are practically indistinguishable. *Id.;* Iowa Code § 550.2; *see Wachovia Sec., L.L.C. v. Stanton*, 571 F.Supp.2d 1014, 1043 (N.D.Iowa 2008) (elements of a statutory claim of misappropriation of trade secrets under Iowa law are "(1) the existence of a trade secret, as defined by Iowa Code § 550.2; (2) acquisition of the secret by improper means, as defined by Iowa Code § 550.2(1); and (3) unauthorized use or disclosure of the secret, as defined in Iowa Code § 550.2(3).").

### 1. Existence of a Trade Secret

Iowa law defines a "trade secret" as

> information, including but not limited to a formula, pattern, compilation, device, method, technique, or process that is both of the following:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain eco-

---

**11.** NCMIC's complaint names PFG in Counts Three and Four. However, NCMIC has not pursued Counts Three and Four against PFG, and accordingly the Court will only analyze Artino's conduct as alleged in Counts Three and Four.

nomic value from its disclosure or use[; and]

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4). The inquiry whether NCMIC's customer spreadsheet constitutes a trade secret is a question of law, while the inquiry whether NCMIC's customer spreadsheet provides independent economic value that is not generally known to the public and whether NCMIC expended reasonable efforts to maintain the secrecy of the customer spreadsheet is a question of fact. *See Econ. Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 648 (Iowa 1995).

■■■ The Iowa Supreme Court considers the following factors in determining whether information constitutes a trade secret under Iowa law:

(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken ... to guard the secrecy of the information; (4) the value of the information [to the business and its competitors]; (5) the amount of effort or money expended ... in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Cemen Tech, Inc. v. Three D Indus., L.L.C.,* 753 N.W.2d 1, 7 (Iowa 2008) (quoting *Kendall/Hunt Publ'g Co. v. Rowe,* 424 N.W.2d 235, 246 (Iowa 1988)). The Iowa Supreme Court has held that

information may also fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures. Trade secrets can range from customer information, to financial information, to information about manufacturing pro-

cesses to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret. We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets.

*US West Commc'ns Inc. v. Office of Consumer Advocate,* 498 N.W.2d 711, 714 (Iowa 1993) (internal citations omitted).

■■■ The method by which an individual obtains information is also probative on whether certain information was intended to remain confidential and not available to the general public. *Cemen Tech,* 753 N.W.2d at 10.

Generally, "[i]nformation that is readily ascertainable by proper means is not protectable as a trade secret, and the acquisition of such information even by improper means is therefore not actionable. . . . However, the accessibility of information, and hence its status as a trade secret, is evaluated in light of the difficulty and cost of acquiring the information by proper means. In some circumstances the actor's decision to employ improper means of acquisition is itself evidence that the information is not readily ascertainable through proper means and is thus protectable as a trade secret. Because of the public interest in deterring the acquisition of information by improper means, doubts regarding the status of information as a trade secret are likely to be resolved in favor of protection when the means of acquisition are clearly improper."

*Id.* (quoting Restatement (Third) of Unfair Competition § 43 cmt. d (citations omitted)). NCMIC's customer spreadsheet contained potential customers' names, addresses, Social Security numbers, and a

credit evaluation performed by NCMIC employees. This list was prepared using a proprietary formula to determine how much credit a potential leasing customer could receive from NCMIC. NCMIC did not release this information to the public because it would give their competition an advantage knowing the precise terms on which NCMIC would be willing to extend credit to potential leasing customers. Accordingly, the Court concludes that NCMIC's customer spreadsheet could legally be considered a trade secret, subject to whether they derived independent economic value and whether NCMIC tried to keep it secret as required by Iowa Code § 550.2(4).

### a. Independent Economic Value

NCMIC's customer spreadsheet provides independent economic value that is not generally known to the public because the contents of the list were not known to or readily ascertainable to NCMIC's competitors in the equipment-leasing business who would profit from the disclosure of NCMIC's customer spreadsheet. *See 205 Corp. v. Brandow,* 517 N.W.2d 548, 550 (Iowa 1994) ("205 Corporation had to show it derived economic value because the recipes were unknown to, and not readily ascertainable by, a person who would profit from their disclosure or use."). NCMIC's credit valuation has value for NCMIC because it serves as the basis for which NCMIC makes credit decisions to potential equipment-leasing customers, including how much credit NCMIC will extend to the customer and on what terms it would offer credit. NCMIC's credit valuation has value for NCMIC's competitors because it reveals which potential customers NCMIC finds as the best credit risks, and in the hands of a competitor it would provide critical information on how to make a better offer to these particular customers and on which customers the competitor would need to

invest additional resources to book this business away from NCMIC.

Artino relies in large part on *Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235 (Iowa 1988), for the proposition that NCMIC's customer spreadsheet is not a trade secret. In *Rowe,* a publishing company alleged that its former employee took a customer list containing the names of authors with whom the publisher would like to establish a business relationship. *Id.* at 237. The Iowa Supreme Court held that this list was not a trade secret because "the information on [the publisher's] list is constantly changing, with names frequently being added or dropped. Such a list is not the sort of definite information to which we have previously afforded trade secret protection." *Id.* at 236. The Court also held that because some of the authors "are not necessarily interested in writing a book at the present time[,] ... [they] have no existing relationship to [the publisher] except that it hopes ... they will someday publish with [the publisher]. In view of this nebulous relationship, ... [the Court] does not think these people can accurately be called prospects." *Id.*

*Rowe* is distinguishable from the present case. First, NCMIC's customer spreadsheet contained a list of customers attending the November 2006 trade show, not merely a list of chiropractors who may or may not want to acquire PSI's chiropractic equipment. Second, NCMIC's customer spreadsheet contained more than the names of possible customers because it included the amount of credit NCMIC was willing to extend to those customers. Third, whether the list was being updated is not dispositive because "[b]usiness information may also fall within the definition of a trade secret, including such matters as *maintenance of data on customer lists* and needs, source of supplies, confidential

costs, price data and figures." *Zumaris,* 538 N.W.2d at 646–47 (quoting *US West Commc'ns,* 498 N.W.2d at 714) (emphasis added). The Court finds by a preponderance of the evidence NCMIC derived independent value that is not generally known to the public from its customer spreadsheet.

### b. Secrecy

NCMIC also expended reasonable efforts to maintain the secrecy of the customer spreadsheet. First, NCMIC and Artino entered into a confidentiality agreement that prevented any unauthorized use of any customer list. "Confidentiality agreements ... may constitute reasonable steps to insure secrecy of information, as required by the Uniform Act." *Cemen Tech,* 753 N.W.2d at 9. Second, the customer spreadsheet was contained on NCMIC's password-protected computer system that only NCMIC employees could access. NCMIC had a reasonable expectation that its employees would not use this customer spreadsheet for the benefit of their competitors. While Artino is correct that some of the information contained on NCMIC's customer spreadsheet was known to other businesses because PSI provided NCMIC with the names, addresses, and Social Security numbers of those customers, this fact is non-responsive to the undisputed facts that (1) Artino obtained the spreadsheet from NCMIC and not PSI, and (2) NCMIC supplemented the spreadsheet with its own credit determinations for each customer that it did not share with non-NCMIC employees. As explained above, disclosure of NCMIC's credit evaluations would place NCMIC at a competitive disadvantage because NCMIC's competitors could use that information to narrowly underbid the terms and conditions of NCMIC's proposed line of credit. While NCMIC did share this information with PSI, it was disclosed for purposes of informing PSI which customers NCMIC had already approved for financing and which customers needed to provide NCMIC more information to make a credit determination in order to maximize the number of leases NCMIC could underwrite at the November 2006 trade show. PSI requested this information for the proper purpose of assisting NCMIC in obtaining credit information from additional customers so NCMIC could book more leases at its trade show, not for the purpose of disclosing this information to NCMIC's competitors so they could better compete against NCMIC. While third-party disclosure was a possible consequence of the needs of this commercial setting, there is no evidence in the record that PSI, or any other vendor, exchanged this sensitive information with other equipment-leasing companies who were competing against NCMIC. Accordingly, the Court finds by a preponderance of the evidence that NCMIC expended reasonable efforts to maintain the secrecy of the customer spreadsheet.

### 2. Trade Secret Acquisition Resulting from a Confidential Relationship

The parties do not dispute this element. *See Lemmon,* 559 N.W.2d at 279 (stating second element of trade secret claim). NCMIC employed Artino, who acted as NCMIC's representative at the November 2006 trade show. Artino had access to NCMIC's customer spreadsheet because he was NCMIC's representative. Artino would not have had access to the customer spreadsheet containing NCMIC's credit determinations if Artino was not NCMIC's representative. The Court concludes that Artino acquired the trade secret as a result of his confidential relationship with NCMIC.

### 3. Misappropriation

Iowa statute defines "misappropriation" of a trade secret, in relevant part, as: "(b)

Disclosure or use of a trade secret by a person who uses improper means to acquire the trade secret; [or] (d) Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Iowa Code § 550.2(3). The Code defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." *Id.* § 550.2(1).

Artino was required by his Employment Agreement to maintain the confidentiality of customer lists, and he was not authorized to use those customer lists in an unauthorized manner. Artino was required by his fiduciary duty of loyalty as a NCMIC officer to maintain the confidentiality of NCMIC's trade secrets, including NCMIC's customer spreadsheet. *See Zumaris*, 538 N.W.2d at 648. Artino and Kerr used NCMIC's customer spreadsheet for personal financial gain. Kerr testified that he and Artino reached an agreement with LEAF for PFG to receive a commission for delivering NCMIC's pre-approved customers to LEAF for PSI leases. At the November 2006 trade show, while representing NCMIC, Artino had an understanding with LEAF that he would be compensated through PFG for referring leases from NCMIC to LEAF, had NCMIC pay for his attendance at the November 2006 trade show, and PFG received commissions from LEAF on January 22, 2007, from Artino's efforts at the November 2006 trade show.

Artino argues he did not use the trade secret improperly because he received NCMIC's customer spreadsheet from Ehlers, a NCMIC employee. It was Artino's subsequent conduct of using the trade secret for the benefit of PFG and LEAF and at the detriment of NCMIC that forms the basis for the misappropriation. Additionally, as previously discussed, Artino was not authorized to book leases on LEAF's behalf and receive commissions from LEAF based on those bookings. Even if Artino never disclosed NCMIC's customer list to LEAF, Artino used the list to benefit LEAF and his new business, PFG. The Court concludes by a preponderance of the evidence that Artino misappropriated NCMIC's trade secret.

### 4. Damages

Iowa law permits damages for Artino's misappropriation of NCMIC's trade secrets. "Damages may include the actual loss caused by the misappropriation, and the unjust enrichment caused by the misappropriation which is not taken into account in computing the actual loss." Iowa Code § 550.4(1). "If a person commits a willful and malicious misappropriation, the court may award exemplary damages in an amount not exceeding twice the award made under subsection 1." *Id.* § 550.4(2). "The decision whether to award exemplary damages is an issue left up to the discretion of the court." *S & W Agency, Inc. v. Foremost Ins. Co.*, 51 F.Supp.2d 983, 993 (N.D.Iowa 1998). The Court may also award actual and reasonable attorneys' fees to the prevailing party if NCMIC can prove Artino acted "willfully and maliciously in the misappropriation." Iowa Code § 550.6.

The losses resulting from Artino's misappropriation of NCMIC's trade secrets are lost profits from leases diverted from NCMIC to LEAF in the amount of $436,384.00. This is the same amount that NCMIC was entitled to recover under Count Two.

While Iowa courts have not defined "willful and malicious misappropriation" under the Iowa Uniform Trade Secrets

Act, courts have interpreted the same phrase in the Illinois Uniform Trade Secrets Act.

> Willful and malicious misappropriation giving rise to punitive damages can arise under varying sets of facts, and the phrase "willful and malicious misappropriation" can include both an intentional misappropriation and a misappropriation resulting from the conscious disregard of the rights of another. The fact that defendant or defendant's agent knew he was acquiring trade secret information indicates willful and malicious misappropriation, and may justify a punitive damage award. However, a situation in which the defendant or defendant's agent did not know but should have known he was acquiring trade secret information lessens the degree of culpability, which may lessen or eliminate the award of punitive damages.

*X–It Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.,* 227 F.Supp.2d 494, 532–33 (E.D.Va.2002) (internal citations omitted).

■ Artino's testimony and the e-mail exchanges between Cole and Artino demonstrate that Artino may not have fully appreciated the extent of his misappropriation of NCMIC's trade secrets. The Court is not satisfied this record supports the requisite finding of malice. Artino's resistance to NCMIC's complaint does not rise to level of being frivolous, unduly prolonging, or harassing in nature, and seems to arise from a sincere difference of opinion on questions of law and fact. *Olson v. Nieman's, Ltd.,* 579 N.W.2d 299, 316 (Iowa 1998). Under such circumstances, attorneys' fees or exemplary damages are not necessary to make NCMIC whole. *Id.* While not excusing Artino's liability under the Iowa Uniform Trade Secrets Act, it does limit his liability to damages proscribed in Iowa Code § 550.4(1). The Court concludes that Artino did not engage in a "willful and malicious misappropriation" of NCMIC's trade secrets.

## D. Count Four: Conversion Against Artino

■ NCMIC alleges that Artino wrongfully converted its customer spreadsheet. "Conversion is the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property. The interference must be so serious that the actor may justly be required to pay the other the full value of the property." *Rowe,* 424 N.W.2d at 247 (internal citations omitted). "The essential elements of conversion are: 1) ownership by the plaintiff or other possessory right in the plaintiff greater than that of the defendant; 2) exercise of dominion or control over chattels by defendant inconsistent with, and in derogation of, plaintiff's possessory rights thereto; and 3) damage to plaintiff." *In re Estate of Bearbower,* 426 N.W.2d 392, 394 n. 1 (Iowa 1988).

Iowa courts list the following factors to consider whether the interference is sufficiently serious as to constitute the tort of conversion:

(a) the extent and duration of the actor's exercise of dominion or control;

(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

(c) the actor's good faith;

(d) the extent and duration of the resulting interference with the other's right of control;

(e) the harm done to the chattel;

(f) the inconvenience and expense caused to the other.

*Rowe,* 424 N.W.2d at 247 (quoting Restatement (Second) of Torts § 222A(2)).

The Court has already established that Artino exercised wrongful control over NCMIC's spreadsheet when it used that spreadsheet to book leases on LEAF's behalf. However, NCMIC has not established that Artino seriously interfered with NCMIC's use of the property. Ehlers e-mailed a copy of the spreadsheet to Artino, and the parties agree that Artino used the spreadsheet, in part, to book leases for NCMIC. Because NCMIC received substantial benefits in the amount of $2.5 million in commissions from Artino's use of the spreadsheet at the November 2006 trade show, this evidence limits the extent of his interference with NCMIC's property rights. This supports the conclusion that Artino did not seriously interfere with NCMIC's possessory interest in the customer spreadsheet. Accordingly, the Court concludes that NCMIC has not established by a preponderance of the evidence that Artino converted NCMIC's customer spreadsheet.[12]

### E. Count Five: Breach of Fiduciary Duty Against Artino

NCMIC alleges that Artino breached his fiduciary duty of loyalty to NCMIC. In order to prove a prima facie case for breach of fiduciary duty, NCMIC must prove, by the preponderance of the evidence, "(1) that [Artino] owed a fiduciary duty to [NCMIC]; (2) that [Artino] breached its fiduciary duty; (3) that the breach of fiduciary duty was a proximate cause of damage to [NCMIC]; and (4) the amount of damages incurred." *Asa–Brandt, Inc. v. ADM Investor Servs.*, 344

F.3d 738, 744 (8th Cir.2003) (applying Iowa law); *Top of Iowa Coop. v. Schewe*, 149 F.Supp.2d 709, 717 (N.D.Iowa.2001) (same); *see also PFS Distrib. Co. v. Raduechel*, 332 F.Supp.2d 1236, 1244 (S.D.Iowa 2004) (stating Iowa law recognizes a cause of action for breach of fiduciary duty by corporate officers and other high-ranking employees).

### 1. Existence of Fiduciary Duty

"A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986). Iowa law "recognize[s] the existence of a common law duty of loyalty which is implied in employment relationships." *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 598 (Iowa 1999). "[C]laims by employers against employees for damages resulting from unfair competition and self-dealing are often brought as claims for breach of fiduciary duty. This is because a principal-agent relationship gives rise to a fiduciary duty of loyalty, and an employer-employee relationship can be closely associated with a principal-agent relationship." *Id.* at 599 (internal citations and quotations omitted). An employee who is in a position of responsibility is considered "[a]n agent [because the employee] usually has greater authority to act for the principal, such as negotiating contracts, while an employee typically renders services at the direction of the employer." *Id.* Iowa law

---

**12.** Even if NCMIC could prove a prima facie case of conversion, it is unsettled that Iowa law would recognize the tort of conversion based on the facts of this case. *See Marley Co. v. FE Petro, Inc.*, 38 F.Supp.2d 1070, 1078 (S.D.Iowa 1998) ("The Iowa Supreme Court is especially unlikely to expand the law of conversion under circumstances where ... the law and concepts related to the misap-

propriation of trade secrets provide a more appropriate avenue of redress for the complainant, and where any recovery under the expanded conversion cause of action would merely be duplicative."); *Rowe*, 424 N.W.2d at 247 (finding the law of conversion inapplicable to design and layout of printed material in a book when the defendant camera-copied and republished the entire book).

recognizes that "directors and officers of a corporation have a fiduciary duty to act in all things wholly *for the benefit of the* corporation." *Greenwood,* 629 N.W.2d at 375. Artino was NCMIC's vice president of the equipment-financing division and was a high level officer of NCMIC until his resignation effective December 1, 2006. The Iowa Supreme Court has also expressly recognized that an employee generally has a fiduciary duty to maintain the secrecy of an employer's trade secrets or proprietary information. *See Zumaris,* 538 N.W.2d at 648. While the Court recognizes that the "circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of the individual case," *Kurth,* 380 N.W.2d at 696, Artino's relationship with NCMIC at the November 2006 trade show was that of a principal-agent whereby NCMIC paid for Artino's attendance at the trade show to advance NCMIC's business interests.

### 2. Breach of Fiduciary Duty and Proximate Causation

█ Artino's fiduciary duty to NCMIC "limits a[n] . . . officer's conduct both as to actions taken on behalf of the corporation and actions taken in the fiduciary's own behalf that may have an effect on the corporation." *Greenwood,* 629 N.W.2d at 375. Artino violated his fiduciary duty at the November 2006 trade show while serving as a NCMIC officer when he entered into an agreement with LEAF to divert leases from NCMIC to LEAF and expended time and effort to establish PFG, a competing business. Artino used NCMIC's resources to facilitate these actions that violated his fiduciary duty of loyalty, such as using NCMIC's computer system and attending the November 2006 trade show at NCMIC's expense. Artino used NCMIC's customer spreadsheet, which he obtained as a NCMIC officer, for the benefit of NCMIC's competitor,

LEAF. Artino would not have had access to this information if he were not a NCMIC employee. As Cole testified, maintaining the secrecy of this list was important because "[LEAF] would know immediately who NCMIC was willing to pre-approve. They wouldn't really have to do any work to stratify the portfolio on who they should target for a lease or a loan." Tr. 102.

Based on the information Artino obtained from NCMIC's customer spreadsheet, Artino was able to book leases for LEAF, and PFG received commissions in the amount of $203,162.68. Kerr admitted he and Artino had entered into an express agreement with LEAF to receive commissions while Artino was a NCMIC employee and attending the November 2006 trade show as NCMIC's representative. Kerr testified that Artino had met with Kerr at least a dozen times to plan their business to divert PSI leases from NCMIC, when Artino executed these plans at the November 2006 trade show. Artino, while denying the full extent of Kerr's testimony, admitted that Artino and Kerr entered into an implied agreement with LEAF that PFG would receive commissions generated from the November 2006 trade show after Artino's resignation from NCMIC became effective. Even if the Court accepts Artino's testimony that NCMIC authorized Artino to book leases for NCMIC's competitors, it was still inconsistent with his role and loyalty as an officer of NCMIC to retain those commissions for himself. However, Artino and PFG did not pay NCMIC any commissions received from LEAF based on Artino's efforts at the November 2006 trade show. The timing of LEAF's payments in January 22, 2007, after Artino resigned from NCMIC, does not change the result because Artino's disloyal actions occurred while he was a NCMIC employee. Most of the leases Artino booked on LEAF's behalf occurred

either on November 29, 2006, or December 13, 2006, and were the result of the efforts Artino expended at the November 2006 trade show while he was a NCMIC employee.

Artino relies on *Midwest Janitorial Supply Corp. v. Greenwood*, 629 N.W.2d 371 (Iowa 2001), for the proposition that an employer has a lower expectation of trust after an employee has resigned. In *Greenwood*, the defendant was a part-owner of a janitorial-supply business who expressed his frustrations with the other owners, and after negotiations between the owners could not produce an amicable resolution, he resigned from the company and entered into a competing enterprise. *Id.* at 373–75. The court concluded that the defendant did not breach his fiduciary duty to his former employer because "even before termination [the defendant] is entitled to make arrangements to compete, except he cannot properly make use of confidential information peculiar to the corporation's business and acquired therefrom." *Id.* at 375 (quoting *Parsons Mobile Prods., Inc. v. Remmert*, 216 Kan. 256, 531 P.2d 428, 432–33 (1975)). Distinguishing the cases cited by the employer that an employee can never compete against his employer until his resignation becomes effective, the Iowa Supreme Court noted "the liability imposed in that case was for self-dealing initiated by the director prior to his resignation and not for initiating a competing business." *Id.* The Court concluded that an employee could breach his fiduciary duty to his employer if "the defendant remained as a director of the corporation and included solicitation of financing for defendant's new company from his former company's leading customers." *Id.* at 375–76.

Artino's conduct is easily distinguishable from the employee's in *Greenwood*. First, Artino's conduct at the November 2006 trade show occurred as a NCMIC officer who was attending the trade show for NCMIC's benefit. Second, Artino never disclosed to NCMIC his intent to compete against NCMIC through PFG or book leases on LEAF's behalf. Third, Artino never expressed any discontent with NCMIC and rather made representations to Cole that he was "tired of the leasing and finance business," which did not put NCMIC on notice to question Artino's motives. Finally, unlike the employee in *Greenwood*, Artino had an eighteen month non-compete restrictive covenant that prevented him from competing against NCMIC, which renders any competition against NCMIC unreasonable and contrary to his Employment Agreement.

The Court finds by the preponderance of the evidence that Artino breached his fiduciary duty as a NCMIC officer, and this breach of fiduciary duty was the proximate cause for Artino and PFG receiving commissions from LEAF.

### 3. Damages

When a disloyal employee breaches his fiduciary duty to his employer by diverting business to the employer's competitors, the employer can recover damages for diverted current business, diverted future business, and misappropriated assets. *See C Plus Nw., Inc. v. DeGroot*, 534 F.Supp.2d 937, 949–50 (S.D.Iowa 2008) (applying Iowa law). "To support an award of actual damages [for the breach of fiduciary duty], the plaintiff must prove that damages have been sustained. Actual damages are recoverable unless it is speculative whether damages have been sustained." *Poulsen v. Russell*, 300 N.W.2d 289, 295 (Iowa 1981). "The Restatement supports the ... award of disgorgement as a remedy for breach of the duty of loyalty. It provides, 'If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a

liability to deliver it, its value, or its proceeds, to the principal.' This rule applies where the agent makes a profit from competing with the principal. Although there are few reported cases addressing the appropriate remedy, those we have found have also required employees to turn over profits received as a result of breaching their duty of loyalty." *Eckard Brandes, Inc. v. Riley,* 338 F.3d 1082, 1087 (9th Cir.2003) (quoting Restatement (Second) of Agency § 403) (internal citations omitted) (applying Hawaii law).

The Court concludes that Artino must return all profits obtained from LEAF. PFG obtained $169,207.51 in commissions from LEAF on January 22, 2007, and $33,955.17 in commissions from LEAF on March 12, 2007, for a total of $203,162.68. Of that amount, PFG paid Artino $27,164.07 based on Artino's efforts at the November 2006 trade show. Artino must return $27,164.07 in commissions paid by PFG to Artino for because these commissions were earned in breach of Artino's fiduciary duty to NCMIC.

NCMIC is not entitled to recover the severance or goodwill payments for Artino's breach of fiduciary duty. While NCMIC is correct that Artino's conduct did breach his fiduciary duty to NCMIC, which is considered "cause" under the Severance and Goodwill Agreements, those contractual damages are not recoverable under the breach of fiduciary duty tort but rather are recoverable under contract.

It is clear that Iowa law does not permit punitive damages for breach of contract. *See Pogge v. Fullerton Lumber Co.,* 277 N.W.2d 916, 920 (Iowa 1979). However, punitive damages may be recoverable for breach of contract "when the breach also constitutes an intentional tort, or other illegal or wrongful act, if committed maliciously." *Id.* Accordingly, breach of fiduciary duty may form the basis for a punitive damage award. Punitive damages are recoverable in order to "punish the party against whom they are awarded and to deter others from similar wrongdoing." *Grefe v. Ross,* 231 N.W.2d 863, 868 (Iowa 1975). "Such damages are appropriate: where defendant acts maliciously, but malice may be inferred where defendant's act is illegal or improper; where the nature of the illegal act is such as to negative any inference of feeling toward the person injured, and is in fact consistent with a complete indifference on the part of the defendant." *Steckelberg v. Randolph,* 448 N.W.2d 458, 462-63 (Iowa 1989). The Court concludes that Artino's conduct does not constitute "complete indifference" toward NCMIC's well-being but resulted from a commercial dispute regarding the scope of Artino's Employment Agreement and whether Artino's conduct would breach the Employment Agreement. While Artino's concerns about the legality of his conduct do not limit his liability for breach of fiduciary duty, they do not support imposition of punitive damages.

### F. Count Six: Tortious Interference with Contract Against PFG

NCMIC alleges that PFG tortiously interfered with its contract rights. To establish a prima facie case of tortious inference with contract, NCMIC must prove the following elements by the preponderance of the evidence: (1) NCMIC had a written contract with Artino; (2) PFG knew of that contract; (3) PFG intentionally and improperly interfered with that contract; (4) the interference caused Artino to breach his contract; and (5) the amount of damages caused. *See Revere Transducers,* 595 N.W.2d at 763 (listing elements).

In determining whether PFG's conduct is improper, the following factors are relevant:

(a) the nature of the act or conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Jones v. Lake Park Care Ctr.*, 569 N.W.2d 369, 377 (Iowa 1997) (quoting *Hunter v. Bd. of Trs.*, 481 N.W.2d 510, 518 (Iowa 1992)).

The Iowa Supreme Court has also observed:

In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper.... [I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

*Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996).

■■■ "A party to a contract cannot be liable for tortious interference with that contract. Only a third-party, separate from the contracting parties, can be liable for such a tort." *Jones*, 569 N.W.2d at 378. "[An individual's] status as an employee of [the employer] does not ipso facto make him a party to any contracts [the employer] might enter, employment or otherwise." *Hunter*, 481 N.W.2d at 518; *cf. Klooster v. N. Iowa State Bank*,

404 N.W.2d 564, 569–70 (Iowa 1987) (holding that a tortious interference claim cannot occur when there is no third party involved and if jury determined the bank acted wrongfully, the plaintiffs had an adequate remedy for breach of contract or abuse of process).

The parties agree NCMIC and Artino entered into the Employment Agreement, satisfying the first element. The Court can impute PFG's knowledge of the Employment Agreement's restrictive covenants from Artino's involvement with PFG, satisfying the second element. Kerr also testified that he was aware of Artino's Employment Agreement's restrictive covenants.

The determinative question on the third and fourth elements is whether PFG's efforts resulted in Artino breaching his Employment Agreement with NCMIC. PFG was the corporate entity that received commissions from LEAF on the condition that PFG's employees, including Kerr and Artino, would book PSI leases for LEAF. PFG knew that these actions would require Artino to breach his Employment Agreement with NCMIC. Kerr testified that he and Artino were working for PFG at the November 2006 trade show when they were booking leases on LEAF's behalf. Kerr testified that these actions occurred while Artino was still a NCMIC officer and that they attempted to hide their conduct from NCMIC. Iowa courts have recognized similar conduct as rising to the level of intentional and improper interference with contractual relations. *See Revere Transducers*, 595 N.W.2d at 768 (holding the defendant tortiously interfered with the plaintiff's employment contracts when (1) the defendant encouraged the plaintiff's employees to violate their confidentiality agreement, (2) the defendant encouraged the plaintiff's employees to not tell the plaintiff that it was compet-

ing against the plaintiff's interests, and (3) the defendant promised employment to plaintiff's employees and further compensation at defendant's company if plaintiff's employees would violate their confidentiality agreement with the plaintiff). The sole purpose for PFG's actions was to compete against NCMIC and have Artino breach his Employment Agreement with NCMIC, making PFG's actions both improper and intentional. PFG encouraged Artino's competition with NCMIC in violation of Artino's Employment Agreement until the Court ordered an injunction on June 13, 2007. Accordingly, the Court determines that NCMIC has proved by a preponderance of the evidence the third and fourth elements of tortious interference with contract claim against PFG.

■ The Court recognizes this is an odd result. Artino was PFG's only shareholder. However, Artino and Kerr were considered business partners. Additionally, PFG was a separate corporate entity created by Artino ostensibly for the purpose of shielding Artino's individual liability. Under these circumstances, the Court finds Artino and PFG are different parties. NCMIC's claim is different than the breach of contract claim at issue in *Klooster v. North Iowa State Bank*, 404 N.W.2d 564, 569–70 (Iowa 1987), which held that a plaintiff can assert against a corporate defendant (1) a breach of contract claim if the contract was between the two parties to the agreement, or (2) the tortious interference with contract claim if the contract involved one party to the agreement claiming a third party interfered with the contract between the two parties to the agreement, but (3) not both claims against the same corporate defendant. Here, NCMIC's breach of contract claim is against Artino for breaching his Employment Agreement with NCMIC, and NCMIC's tortious interference with contract claim is against PFG for encouraging Artino to breach his Employment Agreement.

Artino and PFG are legally distinct, and therefore the fact that PFG is not a party to the Employment Agreement leads to the logical conclusion that PFG can be liable for tortious interference with that Employment Agreement negotiated between NCMIC and Artino, and the fact that Artino is a PFG shareholder does not change the analysis. *See Jones*, 569 N.W.2d at 378.

### 1. Damages

■ Lost profits resulting from the tortious interference of contract are recoverable under Iowa law. *Revere Transducers*, 595 N.W.2d at 770. As NCMIC has established a prima facie case of tortious interference with the contract between NCMIC and Artino against PFG, NCMIC is entitled to lost profit damages. As established in Part III–B–6, NCMIC has proven its lost profits of $436,384.00. The Iowa Supreme Court has adopted joint and several liability under certain circumstances, stating as follows:

> Persons Acting in Concert, reads: For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.
>
> If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the con-

sequences of the other's act. Thus, the Restatement (Second) of Torts specifically provides for joint and several liability when the other person gives substantial encouragement or assistance. *Reilly v. Anderson,* 727 N.W.2d 102, 107 (Iowa 2006) (quoting Restatement (Second) of Torts § 876) (internal citations and quotations omitted).

In this case, NCMIC has proved by the preponderance of the evidence that PFG offered substantial assistance to induce Artino to breach his contract with NCMIC. Accordingly, PFG should be considered jointly and severally liable for these lost profit damages resulting from Artino's breach of his non-compete restrictive covenant with NCMIC.

## IV. DAMAGES

The Court concludes by a preponderance of the evidence that NCMIC is entitled to recovery of $11,193.00 in losses resulting from Artino's CFAA violation as alleged in Count One.

The Court concludes by a preponderance of the evidence that NCMIC is entitled to recovery of $436,384.00 in lost profits and $191,250.00 in contractual damages resulting from Artino's material breach of his Employment and Severance Agreements as alleged in Count Two.

The Court concludes by a preponderance of the evidence that NCMIC is entitled to recovery of $436,384.00 in lost profits resulting from Artino's misappropriation of NCMIC's trade secrets as alleged in Count Three. NCMIC cannot be compensated twice for lost profits under both a breach of contract claim and a misappropriation of trade secrets claim. *See Team Cent., Inc. v. Teamco, Inc.,* 271 N.W.2d 914, 923–26 (Iowa 1978) (concluding Iowa law prohibits double recovery of damages).

The Court concludes by a preponderance of the evidence that NCMIC is enti-tled to recovery of $27,164.07 in commissions paid to Artino from PFG resulting from Artino's breach of fiduciary duty as alleged in Count Five. These damages are for the same conduct as the $436,384.00 lost profits damages awarded on Counts Two and Three. NCMIC has elected to recover damages based on NCMIC's lost profits instead of Artino's gain. *See Home Pride Foods, Inc. v. Johnson,* 262 Neb. 701, 634 N.W.2d 774, 783–84 (Iowa 2001) (finding that lost profits for theft of customer list could be measured by either plaintiff's losses or defendant's gains, at plaintiff's option).

The Court concludes by a preponderance of the evidence that NCMIC is entitled to recovery of $436,384.00 in lost profits resulting from PFG's tortious interference with NCMIC's contract with Artino as alleged in Count Six. These damages are for the same conduct as the $436,384.00 lost profits damages awarded on Counts Two and Three. Under joint and several liability, NCMIC may recover $436,384.00 in lost profits damages from either PFG or Artino.

## V. CONCLUSION

For the reasons stated, the Court finds in favor of Plaintiff NCMIC Finance Corporation and against Defendant William Artino on Counts One, Two, Three, and Five of the Complaint, and against Defendant Pro Funding Group, LLC, on Count Six of the Complaint. The Court finds in favor of Defendant William Artino and against Plaintiff NCMIC Finance Corporation on Count Four of the Complaint. The Court specifically finds NCMIC (1) is entitled to $11,193.00 for Artino's CFAA violation as alleged in Count One, (2) is entitled to $627,634.00 for Artino's breach of his Employment and Severance Agreements as alleged in Count Two, (3) is entitled to $436,384.00 for Artino's misappropriation of NCMIC's trade secrets as alleged in Count Three, (4) is entitled to $27,164.07

for commissions Artino received from PFG resulting from Artino's breach of his fiduciary duty as a NCMIC officer as alleged in Count Five, and (5) is entitled to $436,384.00 for PFG's tortious interference with NCMIC's Employment Agreement with Artino as alleged in Count Six.

The Clerk of Court is hereby ordered to enter judgment in favor of Plaintiff NCMIC Finance Corporation and against William Artino in the amount of $638,827.00, plus interest from the date of judgment, on Counts One, Two, Three, and Five of the Complaint, and against Pro Funding Group, LLC, in the amount of $436,384.00, plus interest from the date of judgment, on Count Six of the Complaint.

The Clerk of Court is hereby ordered to enter judgment in favor of Defendant William Artino and against Plaintiff NCMIC Finance Corporation on Count Four of the Complaint.

In view of the Court's resolution of the various issues, and the fact that neither party is entirely without fault, the Court directs that both sides pay their own fees and costs.

**IT IS SO ORDERED.**